599 A.2d 149

BERNARD GRAHAM AND CLARA GRAHAM, PLAINTIFFS-AP-
PELLANTS, v. ISAAC GIELCHINSKY, M.D., DEFENDANT-RE-
SPONDENT, AND NEWARK BETH ISRAEL MEDICAL CEN-
TER, DEFENDANT.

Argued September 10, 1991—Decided December 11, 1991.

*Bryan D. Garruto* argued the cause for appellants (*Garruto, Galex & Cantor,* attorneys).

*Jeffrey W. Moryan* argued the cause for respondent (*Connell, Foley & Geiser,* attorneys; *Ernest W. Schoellkopff,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns an apparent gap in our Rules of Civil Procedure dealing with the discovery and use of the opinion evidence of an expert consulted by an adversary. Absent exceptional circumstances, our Rules of Civil Procedure do not permit discovery of the names or opinions of experts that a party has consulted but does not intend to call at trial. *See R.* 4:10–2(d)(3). At the same time, however, the Rules do not address whether a litigant may use that information at trial when obtained through means *other* than discovery.

The contested evidence in this case consisted of an opinion of an expert witness, originally consulted by plaintiff Bernard Graham (henceforth we refer only to the injured plaintiff), that no medical malpractice had occurred in the course of defendant Gielchinsky's treatment of plaintiff. (Henceforth "defendant" refers only to Dr. Gielchinsky.) The case concerns the physician's alleged deviation from accepted medical standards in failing to remove pacemaker wires that had been implanted in the patient's chest during cardio-thoracic surgery.

The trial court confronted an unusual situation. Immediately before opening statements, plaintiff moved to bar the testimony of the expert whom Dr. Gielchinsky had listed, presumably for

purposes of jury selection, as a witness he expected to call at trial. Defendant asserts that plaintiff had been unaware that that expert would testify because plaintiff had failed to request a list of defendant's experts in discovery.

In the absence of controlling precedent and because of the unexpected manner in which the issue arose, the trial court allowed defendant to use the expert's favorable opinion evidence. The court, however, prohibited the expert from relying on any confidential information or suggesting that plaintiff had originally consulted him. Despite some references by defense counsel to the original consultation, we are satisfied that the trial court's exercise of discretion was not so clearly erroneous as to have had the capacity to bring about an unjust result. Accordingly, we affirm the judgment of the Appellate Division, which sustained a jury verdict in favor of defendant.

I

For purposes of this appeal, we generally accept the statement of facts in plaintiff's brief. On April 14, 1982, defendant performed an aortic-valve replacement and a coronary bypass on plaintiff at Newark Beth Israel Hospital (Beth Israel). The operation involved attaching a pacemaker and placing five pacemaker wires in Graham's chest. Shortly after the operation, Graham underwent a second procedure to remove the pacemaker and pacemaker wires from his chest; while two of the pacemaker wires were successfully removed, some of the wires were cut at chest level and left in Graham's chest. Subsequently, Graham developed a chest wall infection. On May 14, 1982, Dr. Gielchinsky opened and debrided the wound, removing the dead tissue and draining the infected material. When plaintiff was discharged on July 10, 1982, he was still taking antibiotics for the infection, and his chest was still wrapped in bandages.

When the infection worsened, Dr. Gielchinsky readmitted Graham to Beth Israel. On November 9, 1982, Dr. Gielchinsky

again debrided the infected area. A plastic surgeon created a muscle flap by raising two muscle areas and placing them into the chest wound. The surgeon then placed a skin graft from the plaintiff's thigh over these muscles. The remaining pacemaker wires were not removed during any of these operations.

In September 1983, Graham entered Perth Amboy General Hospital because of an unrelated urological problem. Because his chest was still infected, his attending physician consulted a surgeon who performed exploratory surgery and removed the remaining pacemaker wires. Graham remained in the hospital for two months, went home for approximately a week at Thanksgiving, and then returned to the hospital where the wound was again debrided. The infection then began to clear.

Subsequently, plaintiff filed a complaint alleging that Dr. Gielchinsky had been negligent in failing to remove the pacemaker wires and in failing to take the proper cultures, which would have shown that a foreign body was causing the infection. Graham's original attorney sent him to Dr. Frederick Primich for an examination. Dr. Primich concluded that Dr. Gielchinsky had not been negligent, because the pacemaker wires were not in the operative field and thus not in the area of the infection. Dr. Primich also determined that it would have been inappropriate for a thoracic surgeon to probe for the wires through an infected area because this could lead to the spread of infection and uncontrollable bleeding. Graham's current counsel sent him to a second physician, Dr. Joseph Silva, who concluded that Dr. Gielchinsky had been negligent.

In some undisclosed manner, the defense obtained Dr. Primich's report. Approximately one week before trial defense counsel telephoned Dr. Primich and asked him to testify on Dr. Gielchinsky's behalf. As noted earlier, the court permitted Dr. Primich to testify as an expert for the defense.

The jury returned a verdict in favor of Dr. Gielchinsky. On appeal, plaintiff argued that the court had erred in allowing Dr. Primich to testify as a defense expert; that Dr. Primich had

violated the trial court's ruling, which prohibited him from disclosing the identity of the party who had first retained him; and that in his summation defense counsel had made improper remarks concerning Dr. Primich's impartiality. A majority of the Appellate Division concluded that the trial court had not erred in permitting Dr. Primich to testify as an expert and that the handling of the witness's testimony had not prejudiced plaintiff's case. One member of the panel disagreed, concluding that in arguing in summation that Dr. Primich was an impartial, unbiased witness, defendant grossly distorted the truth and that such a distortion was clearly capable of producing an unjust result. Because of the dissent below, plaintiff appeals to us as of right under *Rule* 2:2-1(a).

## II

To put the issues in perspective, we review the evolution of our rules of discovery and the use of expert evidence. Despite the unintended consequences of discovery abuse that have plagued our system, courts have gradually permitted increased discovery of expert-opinion evidence.

A.   The policies governing the discovery of information held
     by expert witnesses.

The traditional instincts of the adversary system slowed early efforts to discover the opinion of an adverse party's expert. *Smith v. Ford Motor Co.*, 626 *F.*2d 784 (10th Cir.1980), *cert. denied*, 450 *U.S.* 918, 101 *S.Ct.* 1363, 67 *L.Ed.*2d 344 (1981), succinctly states the development of the doctrine, and we merely summarize it here. Early resistance to relaxing the discovery process was premised on the theory that no party should build its case by foraging for opinions from the experts of the other party. *Id.* at 792. Closely related to that was the so-called "work product rule" of *Hickman v. Taylor*, 329 *U.S.* 495, 67 *S.Ct.* 385, 91 *L.Ed.* 451 (1947), which insulates the efforts of an attorney to develop a client's case from discovery.

In addition, the attorney-client privilege prevents both the discovery and the use of such evidence on the basis that the expert was the client's messenger conveying privileged information to the attorney. *Smith, supra,* 626 *F.*2d at 792.

Those conceptual concerns gradually yielded to the more pragmatic realization that it was simply not fair or productive to try cases in the dark. The simplest and most concise statement of that proposition is found in *Moore's Federal Practice:*

> By 1967, when the preliminary draft of what was to become the amended discovery rules of 1970 were circulated, there was a marked trend toward recognition of the fact that when an expert witness is to be put on at the trial effective cross-examination requires advance information as to his identity and the substance of his testimony. [4 James W. Moore *et al., Moore's Federal Practice* ¶ 26.66 (2d ed. 1991).]

The drafters of the 1970 amendments to the Federal Rules of Civil Procedure sought to resolve "this inharmonious state of affairs by providing a uniform, orderly scheme of discovery." *Smith, supra,* 626 *F.*2d at 792. Federal Rule of Civil Procedure 26 now embodies that scheme of discovery.

The 1969 revisions of the New Jersey Rules of Civil Procedure proceeded along a parallel path. In that year, *Rule* 4:10 made "what is clearly one of the most significant practice changes in the entire 1969 revision, and that is its authorization of discovery of opinions of expert witnesses." Sylvia B. Pressler, *Rules Governing the Courts of the State of New Jersey, R.* 4:10–2 comment (1971).

After the 1970 revision of the Federal Rules of Civil Procedure, we again amended our Rules to conform to the federal Rules. *Report of Supreme Court's Committee on Rules,* 1, 28–29 (1972). Both the federal Rule and the state Rule had contemplated the discovery of the opinions only of experts who were to be called as witnesses. *See R.* 4:10–2(d)(1). In her commentary to the revision of the 1969 interrogatory rules Judge Pressler stated, "[t]he second change in this rule [4:17] implemented the expert discovery practice of *R.* 4:10–2 [cover-

ing deposition of experts] by instituting what is in effect a mandatory exchange of the reports of experts—*but, only those experts who are intended to be called as witnesses at trial.*" Pressler, *supra, Rules Governing the Courts of the State of New Jersey, R.* 4:17 comment (1971) (emphasis added).

In short, the dominant theme of those rule changes was that "advance knowledge through pretrial discovery of an expert witness's basis for his opinion is essential for effective cross-examination." Michael H. Graham, *Discovery of Experts Under Rule 26(b)(4) of the Federal Rules of Civil Procedure Part One: An Analytical Study,* 1976 *U.Ill.L.F.* 895, 897. Because there would be no occasion to cross-examine the expert who would not be produced at trial, there was no need to provide for discovery of the expert's opinion.

Significantly, however, those Rules allowed, as do the current Rules, the discovery of the opinion of a non-testifying expert whom another party had retained or employed "in anticipation of litigation or preparation for trial" only on a showing of "exceptional circumstances." *R.* 4:10–2(d)(3). *See Koutsouflakis v. Schirmer,* 247 *N.J.Super.* 139, 588 *A.*2d 893 (Law Div.1991).

B.  The policies governing the use of testimony of an adverse party's expert.

A similar course of legal reasoning marks the gradual development of the use of the opinion evidence of an adversary's expert. Despite Wigmore's oft-repeated maxim that "the public has a right to every man's evidence" (and today we would say as well, every woman's evidence), 8 *Wigmore on Evidence* § 2192 (McNaughton rev. 1961), some courts have qualified that general rule. Some jurisdictions simply will not compel an expert whom an adversary had initially consulted to appear as a witness. Lori J. Henkel, Annotation, *Experts—Compelled Testimony,* 66 *A.L.R.* 4th 213, 225–40 (1988). Other courts apply the rule favoring testimonial compulsion to all experts, including doctors, appraisers, and others. *Id.* at 223–24. Thus, in *Kaufman v. Edelstein,* 539 *F.*2d 811 (2d Cir.1976), in which the

government subpoenaed renowned computer-system consultants to express their expert opinions concerning market monopoly of electronic data processing, the Court of Appeals stated that no justification exists for a "rule that would wholly exempt experts from placing before a tribunal factual knowledge relating to the case in hand * * *." *Id.* at 821. Such rulings create the anomaly that although a party cannot depose an adversary's non-testifying expert, a court can compel the witness to testify at trial.

Condemnation cases present the most familiar context in which parties have sought to obtain the opinion of an adversary's expert. There, courts motivated by a perception of injustice, have allowed or even compelled admission of the appraisal opinion that property has a value different from that asserted in the proceedings. *See Town of Thomaston v. Ives,* 239 *A.*2d 515 (Conn.1968); *State v. Steinkraus,* 76 *N.M.* 617, 417 *P.*2d 431 (1966).

Obviously, there is a good deal of impracticality about all of this. As a canny Georgia judge has noted, "if an expert is required to testify for the usual witness fee of $10.00 a day, you are likely to get about $10.00 worth of testimony." *Nationwide Mut. Ins. Co. v. Glaccum,* 186 *Ga.App.* 148, 366 *S.E.*2d 772, 774 (1988). Still, on occasion a party gains access to the adversary's expert reports. In *Fenlon v. Thayer,* 127 N.H. 702, 506 *A.*2d 319 (1986), a medical malpractice case, the court concluded that not to permit an injured plaintiff to subpoena a doctor who had concluded that there was evidence of malpractice in the treatment of the plaintiff was prejudicial error. The defendant had originally consulted this doctor as a potential expert witness. The New Hampshire court relied on the following rather untidy formulation from an *A.L.R.* annotation: "An important consideration in determining whether one employed as an expert by one party may or should be required to testify as such at the instance of the adverse party is whether, under the particular circumstances, it is fair to do so." Annotation, *Compelling Expert to Testify,* 77 *A.L.R.*2d 1182,

1192 (1961) (citing *Ramacorti v. Boston Redevelopment Auth.*, 341 *Mass.* 377, 170 *N.E.*2d 323 (1960)). Thus, in *Granger v. Wisner*, 134 *Ariz.* 377, 656 *P.*2d 1238 (1982), a case very similar to this one, the Arizona Supreme Court concluded that an expert witness whom the plaintiff's attorney had consulted could testify on behalf of the defendant that in the expert's opinion the defendant had not committed malpractice. That court emphasized that counsel had not questioned the witness about, and the witness had not testified to, any confidential communications with the plaintiff or her previous counsel. The expert based his testimony solely on his education, training, experience, and a review of the records. *Id.* at 1241. Allowing expert testimony that does not divulge confidential information promotes a primary concern of the courts, namely, "to elicit truth essential to correct adjudication." *Sachs v. Aluminum Co. of Am.*, 167 *F.*2d 570 (6th Cir.1948).

Although New Jersey is in the minority of jurisdictions in not allowing the compulsion of expert opinion testimony, see *Genovese v. New Jersey Transit Rail Operations*, 234 *N.J.Super.* 375, 560 *A.*2d 1272 (App.Div.), *certif. denied*, 118 *N.J.* 195, 570 *A.*2d 960 (1989), our courts have seldom confronted the issue of whether an adversarial expert may be permitted to testify against the party that originally retained the expert.

Our decisional law addressing that issue is not uniform. When the expert is a treating physician, our trial courts are divided. In *Piller v. Kovarsky*, 194 *N.J.Super.* 392, 476 *A.*2d 1279 (Law Div.1984), the court concluded that the physician-patient relationship would "preclude a physician from testifying against his patient as a liability expert, at least in a medical malpractice action involving the very condition for which the physician has treated the patient." *Id.* at 399, 476 *A.*2d 1279. The court reasoned that such testimony "could not help but have a detrimental effect on the quality of the [physician-patient] relationship, and who can say that this would not thereby affect the well-being of the patient." *Id.* at 398, 476 *A.*2d 1279.

Similarly, in *Serrano v. Levitsky*, 215 *N.J.Super.* 454, 521 *A.*2d 1377 (Law Div.1986), the court refused to allow defendant to call plaintiff's primary treating physician or cross-examine him on a portion of his report in which he had gratuitously included his opinion that defendant-doctor had not been negligent. In supplying the report to defendant, plaintiff had emphasized that he was not adopting the doctor's opinion on the liability aspect of the case. The court reasoned that *Rule* 4:10–2(d)(3) allows an opposing party to discover the opinion of a non-testifying expert only on a showing of exceptional circumstances. Because the defendant could not make that showing, the court precluded the testimony. *Id.* at 459, 521 *A.*2d 1377.

But in *Kurdek v. West Orange Board of Education*, 222 *N.J.Super.* 218, 536 *A.*2d 332 (Law Div.1987), the court allowed the defendant to call the plaintiff's treating physician as its witness on the issue of permanency of injury, reasoning that a trial is "essentially a search for the truth." *Id.* at 226, 536 *A.*2d 332. The court informed the witness that he had no obligation to serve as an expert for the defendant, but the doctor was willing to do so. *Id.* at 221, 536 *A.*2d 332.

The trial court in *Cogdell v. Brown*, 220 *N.J.Super.* 330, 531 *A.*2d 1379 (Law Div.1987), also faced an unusual factual situation. That court allowed an examining physician, who after being consulted by the defendant, had submitted a report on the defendant's behalf, to testify as the plaintiff's witness. The plaintiff's attorney had informed opposing counsel well in advance of trial that he intended to use the witness. *Id.* at 333, 531 *A.*2d 1379. Immediately before jury selection, newly-assigned defense counsel moved to prevent the doctor's testimony. The court denied the motion, reasoning that under those unusual circumstances, excluding the testimony would deprive the plaintiff of a fair trial. *Ibid.*

Cases adopting the search-for-truth rationale do not, however, explain the anomaly that under our Rules of discovery, absent exceptional circumstances the opinion evidence of an expert not expected to testify at trial cannot be discovered,

much less admitted as evidence. *Genovese, supra,* 234 *N.J.Super.* 375, 560 *A.*2d 1272, offers perhaps the most useful formulation of an organizing principle. In that case, the plaintiff sought to use the videotaped deposition testimony of an expert whom the defendant did not intend to call as a witness. The Appellate Division refused to permit its use, despite the fact that the opinion was not under compulsion. The court ruled that "an expert's deposition taken pursuant to *Rule* 4:14-9(e) should not be substantively useable by an adversary over objection." *Id.* at 381, 560 *A.*2d 1272.

The *Genovese* court observed that a videotaped deposition of a treating physician or expert witness under *Rule* 4:14-9(e), unlike a *de bene esse* deposition (one that is taken provisionally for use if the witness is unavailable at the time of trial, see *Rule* 4:11-3), may be used at trial in lieu of testimony whether or not the witness is available to testify. Still, the court held that the efficient administration of trials and the fair balance of the parties' interests would not be advanced by permitting the opposing party to use such testimony. It reasoned that *Rule* 4:14-9(e)

> is a valuable innovation whose use should be encouraged. It is cheaper for litigants, more convenient for experts, and more efficient for the court to permit a party to present a videotaped deposition if the party elects to do so. It would discourage the use of the device if an expert's deposition could be used substantively by the other side. [*Ibid.*]

In short, if the search-for-truth rationale trumped all other policies of law, we would have provided for the discovery of all experts' reports without requiring a showing of "exceptional circumstances" under *Rule* 4:10-2(d)(3).

C. Permitting a party to use non-discoverable expert testimony obtained by an adversary does not advance "the efficient administration of trials and the fair balance of the parties' interests" in the absence of exceptional circumstances.

As noted, two policies conflict in cases such as this. As the Appellate Division stated, one general policy mandates that the

"interests of truth outweigh[ ] any expectation of allegiance a party might have in consulting a prospective witness in preparation for trial * * *." 241 *N.J.Super.* 108, 113, 574 *A.*2d 496 (1990). Generally speaking, courts should admit all relevant evidence that will bear on the just disposition of a cause. On the other hand, an unavoidable element of unfairness exists in admitting such expert opinion evidence. Recall that the original thesis for the discovery of the opinion of an adverse expert was to permit effective cross-examination at trial. However, the various conditions that courts place on the use of such evidence before a party can present it to a jury create barriers to effective cross-examination.

For instance, in this case Dr. Primich requested a subpoena and was presented as a witness who appeared in response to the subpoena. However, Dr. Primich was anything but a compelled witness. Under New Jersey law, that he could be compelled to give such expert opinion testimony is highly unlikely. *See Genovese, supra,* 234 *N.J.Super.* 375, 560 *A.*2d 1272. Of course, a case might arise in which paramount public policies would require that an expert testify under compulsion. An example might be that of a safety expert who had investigated an aircraft accident, or as in *Kaufman, supra,* 539 *F.*2d 811, a long-standing observation of a complex series of events. This is surely not such a case.

An air of unreality pervaded the trial. Obviously, the witness had an underlying motivation for testifying. Was there a continuing relationship with either the defendant or some members of the defense team? That factor would remain unexplored if a lawyer could not effectively cross-examine the expert without, at the same time, disclosing the client's initial relationship. One may say that it hinders the search for truth not to permit such a witness to testify. One may say, with equal persuasiveness, that it hinders the search for truth to limit the effective cross-examination of such a witness. It is not a matter of letting lawyers shop for a hired gun. It is simply a matter of placing the lawyer who sought the opinion of such an

expert in an impossible situation. Countless claims of malpractice would be leveled against attorneys who put unfavorable expert evidence in as part of their clients' case-in-chief. Certainly there are experts who are wrong, and no unfair advantage should be taken of a lawyer's attempt to evaluate a client's case.

Our system is committed to a search for truth within the context of the adversary system. Over the years that system has provided a reliable measure of justice. As an integral part of that adversarial system, the attorney's work product should be protected, subject to trial-fairness requirements. *See* Pressler, *Rules Governing the Courts of the State of New Jersey* R. 4:10–2(c) comment (1992).

In sum, we have molded our Rules of practice to reflect policy concerns in the area of expert witnesses. *Genovese, supra,* 234 *N.J.Super.* 375, 560 *A.*2d 1272; *Piller v. Kovarsky, supra,* 194 *N.J.Super.* 392, 476 *A.*2d 1279. Because effective cross-examination of such witnesses is inherently limited, truth has a better chance to emerge if the use of an adversary's expert is the exception, not the rule. Hence, we hold that in the absence of exceptional circumstances, as defined under *Rule* 4:10–2(d)(3), courts should not allow the opinion testimony of an expert originally consulted by an adversary. Of course, a party may try to corner the market on available experts by tying up those few with expertise. We rather suspect that that circumstance may be more fanciful than real. As has been noted, "[t]he business of being an expert has become a cottage industry." Joseph M. McLaughlin, *Discovery and Admissibility of Expert Testimony,* 63 *Notre Dame L.Rev.* 760, 763 (1988). The "exceptional circumstances" requirement addresses that concern over witness unavailability as well as the concerns of surprise and unfairness. Thomas R. Trenker, Annotation, *Pretrial Discovery Of Facts Known and Opinions Held by Opponent's Experts Under Rule 26(b)(4) of Federal Rules of Civil Procedure,* 33 *A.L.R. Fed.* 403 (1977).

The circumstances of this case are not likely to recur. Usually, parties will resolve such issues in the pretrial process. Still, we benefit from but limited experience in the day-to-day practicalities of the trial of such matters. There may be just as many problems with a general rule of exclusion. For example, when the public interest is involved, supervening policy concerns may require the use of such evidence to prevent misuse of either the public trust or public funds. *See Steinkraus, supra,* 417 *P.*2d at 433 (allowing landowners to call State's expert appraiser to testify on their behalf because State must ensure that land is "obtained at a price fair to the public [and] it also has a duty to the property owner to see that he is fairly compensated"). Because of those uncertainties, we leave future refinements of the Rule to our Civil Practice Committee. That Committee is better equipped to evaluate evidence of the competing policy concerns that must be conjoined to produce a fair trial. Obviously, situations will arise in which trial surprise or other unfairness will require that such expert opinion evidence be allowed. *See Cogdell, supra,* 220 *N.J.Super.* 330, 531 *A.*2d 1379. Those situations are rare. Pending further refinement of the rule, in the absence of "exceptional circumstances" courts should not admit such evidence.

### III

■ We turn, then, to the final concern in this case: whether trial counsel circumvented the safeguards that the court below imposed.

Plaintiff argues that several of the questions that defense counsel put to Dr. Primich on direct examination contravened the trial court's direction. Defense counsel established through Dr. Primich that Graham had brought hospital records with him at the time of the examination and that Dr. Primich "felt" that plaintiff might take future legal action, although he answered "no" when asked whether he knew that the case involved a lawsuit. Counsel also asked whether he had known at the time

of the examination that he was being asked for an independent review, and whether prior to writing his report defense counsel or anyone else had communicated with him on Dr. Gielchinsky's behalf. The court sustained objections to both questions.

Plaintiff also argues that in his summation counsel for Dr. Gielchinsky improperly suggested that Dr. Primich had originally been retained by plaintiff. In particular, plaintiff points to the following language:

Now, Dr. Primich examined the plaintiff in 1985. When he examined the plaintiff, he had records and he looked at those records and he thought about the matter for about a month, and then he wrote an opinion and it is interesting to note that that opinion was written in July 1985, but Dr. Silva [plaintiff's expert] was never given a copy of it * * *.

Dr. Primich's report was written a year and a half after the operation, was subpoenaed to come here to testify. Not a paid expert. Nobody retained him on behalf of Dr. Gielchinsky to come here and testify.

The contention that defense counsel stated in his summation that plaintiff had brought with him to the examination the records on which Dr. Primich relied is unsound. The only mention of the records in defense counsel's summation was that Dr. Primich had referred to the records.

The most objectionable reference by defense counsel to Dr. Primich's putative impartiality lasted only briefly during an extended summation. The doctor himself had apparently requested a subpoena; it does not appear to have been part of a subterfuge by counsel.

Finally, we note that competent medical evidence other than Dr. Primich's informed the jury's decision. This was not a case in which the surgeon forgetfully left the pacemaker wires in the patient's body. The jury was easily able to grasp the idea that it would have been more dangerous to probe for the wires than to leave them intact. The plastic surgeon who created the muscle flap told the jury that the wires were not in the operative field of infection and that it would have been "too dangerous" to probe for them when the wound was debrided. The defense expert testified that "you risk your patient's life

by going after those wires vigorously" where there is no sign that the pacemaker wires are infected.

We are satisfied that in the circumstances of this case, the trial tactics did not prejudice the trial of the issues.

The judgment of the Appellate Division is affirmed.

*For affirmance—*

Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN— 7.

*For reversal—*None.