711 A.2d 967 (1998)
312 N.J. Super. 365
Jane MOORE, Plaintiff-Respondent,
v.
Sri KANTHA, M.D., Defendant-Appellant, and
The MEADOWLANDS PAIN MANAGEMENT CENTER (improperly pleaded as the Essex County Pain Management Center), Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 1998.
Decided June 25, 1998.
*968 Michael R. Ricciardulli, Hackensack, for defendant-appellant (Ruprecht & Hart, attorneys; David P. Weeks of counsel; Mr. Ricciardulli, on the brief.)
Maurice J. Donovan, West Orange, for plaintiff-respondent (Benjamin M. Del Vento, attorney; Mr. Donovan, of counsel and on the brief).
Before Judges STERN, KLEINER and KIMMELMAN.
The opinion of the court was delivered by
KLEINER, J.A.D.
Defendant, Sri Kantha (Kantha), appeals from a jury verdict in favor of plaintiff, Jane Moore, in this medical malpractice case. Defendant also appeals from the denial of his motion for a new trial.
Defendant alleges that the trial judge erred in: 1) allowing plaintiff's counsel to read portions of defendant's expert's videotaped deposition into evidence; 2) directing a verdict on the issue of informed consent; 3) failing to instruct the jury that the partial judgment for plaintiff on informed consent could not form the basis for its finding as to whether defendant deviated from the accepted standards of care on the medical malpractice claim; 4) denying his motion for a new trial even though the jury verdict was excessive, and in failing to grant a remittitur; and 5) imposing sanctions as a result of defendant's failure to provide plaintiff with her treating physicians' records.
We conclude from the unique facts of this case that the trial judge's deviation from the *969 dictates of Graham v. Gielchinsky, 126 N.J. 361, 599 A.2d 149 (1991), and his conclusion that the use of defendant's retained expert's de bene esse deposition constituted an exceptional circumstance within the purview of R. 4:10-2(d)(3), was reasonable and within the trial judge's discretion. Alternatively, even were we to conclude that the trial judge erred, that error was harmless, thus not justifying a reversal of the jury verdict and the order for judgment entered thereon. We find that defendant's remaining contentions are without merit. Accordingly, we affirm.

I.
The trial in this case was the third trial following two prior mistrials. Prior to the first trial, a discovery and de bene esse deposition of defendant's medical expert was conducted and videotaped. On August 21, 1995, the first trial commenced. Prior to opening statements, defendant withdrew Robert B. King, M.D. as an expert witness. Plaintiff's counsel moved to admit portions of King's videotaped de bene esse deposition. Judge Yanoff concluded that plaintiff had been unfairly surprised by defendant's decision not to use King as an expert witness, and therefore held that the videotaped deposition was admissible.
Prior to the close of plaintiff's case and after plaintiff's medical expert had testified, plaintiff's counsel moved to bar defendant's medical expert, Jerold B. Graff, from using medical records obtained from plaintiff's treating physicians, Kevin Leen and Gary Rombough, which were not provided to plaintiff by defendant in discovery. The judge granted a mistrial after concluding that defendant's counsel should have provided the records to plaintiff, and that the records were "absolutely crucial" to plaintiff's case. Plaintiff's counsel moved for sanctions, costs and counsel fees. Ultimately, a sanction of $12,500 was imposed, but payment was stayed until the conclusion of the new trial.
A second trial before Judge Yanoff and a jury commenced on November 18, 1996. During plaintiff's counsel's opening statement, he informed the jury that they would see the videotaped deposition of King. Defendant's counsel objected to the comment and the use of the videotape at trial. The trial judge sustained the objection and held that King's deposition was not admissible. The judge granted plaintiff's motion for a mistrial.
The third trial, which forms the basis for this appeal, took place in June 1997 before Judge Yanoff and a jury. Prior to opening arguments, plaintiff's counsel again moved to admit King's videotaped deposition. This time the judge held that portions of the deposition were admissible. At the conclusion of the trial the jury found in favor of plaintiff and awarded her $150,000 in compensatory damages. Defendant's subsequent motion for a new trial was denied. However, the judge reduced the sanctions and costs previously imposed against defendant from $12,500 to $2,500.

II.
In 1983, plaintiff suffered an initial outbreak of shingles or herpes zoster,[1] which resulted in blisters in the area under her right breast and around her right side, for which she was hospitalized for approximately one week. After her discharge, plaintiff's blisters "burst," resulting in scars which looked like white patches. Plaintiff testified that after the blisters healed, she continued to experience a constant itch in the affected areas which she described as "sometimes ... bad, and other times ... alright." Plaintiff indicated that she also experienced pain if she "pressed" on the affected area.
Plaintiff was diagnosed with postherpetic neuralgia, an acute, chronic condition which occurs following an initial outbreak of shingles in approximately twenty percent of patients. Symptoms of postherpetic neuralgia are sensitivity to touch, pain and itching in the affected area.
According to plaintiff, between 1983 and April 15, 1991, she was medically treated on two occasions: in 1984 by Dr. Kevin Leen *970 primarily for the itch attributable to shingles and for pain in her right chest; and in January 1989 by Dr. Gary Rombough for injury to her right ribs and shoulder as a result of a fall in a supermarket.
On April 15, 1991, plaintiff went to defendant Meadowlands Pain Management Center[2] and was examined by Kantha. According to defendant, he observed scars in the "distribution of [plaintiff's] fourth, fifth, and sixth chest nerves" or "thoracic dermatomes." Plaintiff also described suffering from "pain and itching, aching, [and a] sore breast." As a result, defendant concluded that plaintiff "was in moderate distress due to post-herpetic neuralgia." Defendant recommended that plaintiff undergo treatment consisting of a series of three epidural steroid injections into the spinal area. However, plaintiff declined the treatment because she could not afford it. Defendant did not discuss any alternative forms of treatment and did not discuss prescribing any medication for plaintiff's condition. Defendant testified and stipulated at trial that he specifically did not discuss prescribing for plaintiff acetylsalicylic acid ("ASA"), the active ingredient in aspirin, dissolved in chloroform.
On April 18, 1991, defendant mailed plaintiff a prescription for 100 cc's of a threepercent solution of ASA dissolved in chloroform. The prescription provided that plaintiff was to apply 1 cc of the solution locally, three times per day, in an open space, and was to avoid contact with her eyes. The prescription came with no forwarding letter or other instructions. Defendant testified that he sent plaintiff the prescription because he felt "bad" that she could not afford the recommended treatment of steroid injections. Plaintiff testified that she thought it was "kind" of defendant to send her a prescription.
On April 25, 1991, plaintiff received the prescribed medicine from a pharmacy. Plaintiff took the medicine home, disrobed and, with the help of her daughter, applied the ASA solution to the area under her right breast using the eyedropper provided with the prescription. Plaintiff immediately felt a "terrible" burning in the area where the solution had been applied. She put ice on the area. Over the course of the weekend the pain became worse and the area had become festered and yellow with pus.
On Monday, April 29, 1991, plaintiff telephoned defendant, who instructed her to come to his office. Plaintiff told defendant that she could not get to the office because she could not get a ride and could not get her clothes on. Defendant then instructed plaintiff to "see her doctor immediately."
On April 30, 1991, plaintiff went to Dr. Leen's office where she was diagnosed as having sustained an approximately five-inch by five-inch infected third-degree burn beneath her right breast as a result of using the ASA solution. She was treated with antibiotics and the burns eventually healed. The pain, however, did not go away. She described it as a constant throbbing in the area under her right breast and sharp knifelike pain shooting into her back. The pain was constant, and ranked a one hundred on a scale of one to one hundred. Plaintiff testified that she had never experienced this type of severe pain before.[3]
As a result, plaintiff testified that she has been unable to work as a nanny despite her desire and job offers to do so. She also testified that the constant pain made concentrating difficult, and her sleep was disturbed and restless. She could not interact with her grandchildren to the same degree as she had in the past, as they were afraid to touch her for fear of hurting her. Additionally, she could no longer wear a bra or form-fitting clothes, which made her feel "[t]errible." She was also unable to do housework unassisted. She testified that she did not "feel too much [sic] about myself. I don't think I'm worth much anymore."
Plaintiff's expert dermatologist, Victor Silverstein, testified that he was not critical of *971 the fact that defendant Kantha attempted to use ASA dissolved in chloroform to treat plaintiff's postherpetic neuralgia, but of the way in which defendant had prescribed the medication. For example, Silverstein testified that defendant deviated from accepted medical practice in prescribing, without adequate explanation and without disclosing the medical risks associated with its use, a medication which could burn a patient. According to Silverstein, it was known at the time of this incident that ASA, an acid, had a tendency to burn when applied to the skin. Silverstein testified that defendant had failed to obtain plaintiff's informed consent before prescribing the medication.
Silverstein also testified that defendant deviated from acceptable care by mailing the prescription to plaintiff and permitting her to apply it at home without adequate instructions. Silverstein explained that in 1991 the use of ASA in chloroform was an "experimental" treatment for postherpetic neuralgia with unknown risks and reactions. As such, the standard of care required that defendant personally apply the solution to a small test area on plaintiff's skin to observe any adverse reaction.
Silverstein testified that these deviations caused plaintiff's injury. He explained that the blistering under plaintiff's breast caused by the herpes had left scar tissue which was thinner and weaker than normal skin. The application of chloroform, a solvent, dissolved the skin's natural protective oily layer. ASA, an acid, when applied to the unprotected, compromised skin under plaintiff's breast, caused a chemical reaction or a burn. The effect was exacerbated when the solution became trapped in the skin folds under plaintiff's breast, causing it to be rubbed into the sensitive skin and resulting in a third-degree burn. The third-degree burn irritated the already compromised nerve endings, reactivating the original herpes pain and sensitivity. According to Silverstein, plaintiff's pain was permanent and no treatments were available to alleviate it. As of the date of trial, plaintiff was sixty-seven years old.
Pursuant to Judge Yanoff's pre-trial ruling, plaintiff's counsel then read to the jury unredacted portions of the videotaped testimony of defendant's expert neurological surgeon, Robert King.
Dr. King was the leading proponent of the use of ASA or aspirin in chloroform for the treatment of postherpetic neuralgia. In fact, King's 1988 clinical note published in a medical journal, describing the use of aspirin in chloroform on twelve patients with postherpetic neuralgia, was the only reference material available describing this treatment. King, Concerning the Management of Pain Associated with Herpes Zoster and of Postherpetic Neuralgia, 33 Pain 73 (1988).[4] The article does not, however, discuss whether burns are a risk of using aspirin or ASA in chloroform on patients suffering from postherpetic neuralgia.
King testified that the symptoms of postherpetic neuralgia are "sensitive skin to the touch" in the affected area, scarring, and pain which is often described as "sharp, throbbing, heavy ache, [and] burning." Plaintiff had scars in the area underneath her right breast.
King testified that defendant's prescription of three grams of ASA in chloroform was not "unreasonable" for the treatment of postherpetic neuralgia, but that he usually prescribes aspirin in a "free-standing powder" form, which consists of ASA and some chalk dissolved in chloroform. King admitted that the only difference between the prescriptions was that aspirin, as opposed to ASA, dissolved in chloroform left a white powder residue enabling the physician to tell where the treatment had been applied.
Regarding the method of application, King testified that it is generally "a matter of style." He gave his patients detailed instructions regarding the risks and benefits of the treatment, demonstrated the proper application, and applied the first few applications of the solution to his patients in his office. He also applied the solution with a cotton ball, not an eye dropper. If a patient were to *972 apply the solution to the area under her breast, King would instruct the patient to "[b]e very careful," making sure that the solution was dry before allowing the breast to touch the treated area to prevent burns.
King learned about this treatment from an unnamed doctor who had told King that he was using it "with great success." King began using this treatment on his patients in the 1970's, and had treated over one hundred patients. He testified that of those patients, approximately six to twelve had been burned by the treatment because the chloroform had not evaporated under a skin fold. King believed that the chloroform caused the burn.
King testified that there had been no clinical trials to test the use of aspirin or ASA in chloroform on patients with postherpetic neuralgia. The solution was also not FDAapproved and was not listed in the Physician's Desk Reference. He also agreed that at the time of this incident the use of ASA in chloroform was a relatively new treatment for postherpetic neuralgia.

III.
Defendant testified that he had first become aware of the use of ASA in chloroform to treat postherpetic neuralgia by reading King's 1988 article. He subsequently attended meetings where the use of ASA in chloroform was discussed. As a result, he prescribed the ASA in chloroform solution to approximately fifty patients, none of whom reported an adverse reaction. Defendant admitted that in 1991 he was aware that aspirin taken internally could irritate the lining of the stomach causing gastro-intestinal distress.
Dr. Gerald Graff, defendant's expert dermatologist, testified that defendant did not deviate from the accepted standards of care in failing to inform plaintiff about the risks associated with the use of ASA in chloroform because there were no reported risks in any of the medical literature. Graff admitted that plaintiff had suffered a localized burn in the area where the ASA in chloroform solution had been applied.

IV.
Defendant argues in point one that the trial judge erred in allowing plaintiff's counsel to read unredacted portions of defendant's expert's videotaped deposition. We disagree.
Judge Yanoff concluded that King was the leading proponent of the ASA in chloroform treatment and that his 1988 clinical note was the only literature discussing this procedure. Thus, the judge held this case presented an "exceptional circumstance" justifying admission pursuant to R. 4:10-2(d)(3) which provides, in part:
A party may discover facts known or opinions held by an expert ... who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means. (emphasis added).
In reaching this decision, the judge considered the implications of both R. 4:16-1(c) and R. 4:14-9(e), the Supreme Court's decision in Graham v. Gielchinsky, 126 N.J. 361, 363, 599 A.2d 149 (1991) (recognizing that admission of evidence is generally addressed to the trial judge's sound discretion), and our decision in Genovese v. New Jersey Transit Rail Operations, Inc., 234 N.J.Super. 375, 560 A.2d 1272 (App.Div.), certif. denied, 118 N.J. 196, 570 A.2d 960 (1989). In Genovese, we reasoned:
It is cheaper for litigants, more convenient for experts, and more efficient for the court to permit a party to present a videotaped deposition if the party elects to do so. It would discourage the use of the device if an expert's deposition could be used substantively by the other side. No useful purpose would be served. Furtherance of the Rule's purposes dictates that a trial court should not ordinarily permit the use by another party of an R. 4:14-9(e) deposition of a treating physician or an expert as substantive evidence.

[Id. at 381, 560 A.2d 1272.] *973 Nevertheless, the court indicated that "[t]here may be special circumstances justifying exceptions to the general rule." Ibid.[5]
Several federal courts have addressed this issue in applying Fed.R.Civ.P. 26(b)(4)(B)[6], which is identical to R. 4:10-2(d)(3). The federal rule was designed to promote fairness by "precluding unreasonable access to an opposing party's diligent trial preparation." Durflinger v. Artiles, 727 F.2d 888, 891 (10th Cir.1984) (citing Advisory Committee Notes, Fed.R.Civ.P. 26(b)(4)(B)). Generally, the party seeking to discover or admit into evidence his or her adversary's expert opinion under the federal rule "`carries a heavy burden' in demonstrating the existence of exceptional circumstances." Ager v. Jane C. Stormont Hosp. and Training Sch. for Nurses, 622 F.2d 496, 503 (10th Cir.1980) (quoting Hoover v. United States Dept. of Interior, 611 F.2d 1132, 1142 n. 13 (5th Cir.1980)). One method of showing "exceptional circumstances" under the federal rule is by establishing that there are no other available experts, other than the adversary's, in the same field or subject area. Marine Petroleum Co. v. Champlin Petroleum Co., 641 F.2d 984, 993-94 (D.C.Cir.1979) (holding that the plaintiff Marine did not carry its burden of demonstrating exceptional circumstances because it did not show that it was "impracticable" for it to obtain facts or opinions on the same subject by means other than the defendant's expert); Eliasen v. Hamilton, 111 F.R.D. 396, 402 (N.D.Ill.1986) (holding that the defendant failed to show exceptional circumstances because there were other experts available in the same field or subject area).
Here, the question was whether plaintiff established that it was "impracticable" for her to "obtain facts or opinions on the same subject by other means...." R. 4:10-2(d)(3); see Graham, supra, 126 N.J. at 373, 599 A.2d 149. It is undisputed that King was the leading proponent of the use of ASA or aspirin in chloroform to treat postherpetic neuralgia. It was also undisputed that King's 1988 clinical note was the only medical reference in existence regarding the treatment. Additionally, according to this record King had conducted the only investigation or evaluation of the effects of the treatment. In fact, defendant became aware of the treatment by reading King's 1988 clinical note.
One additional consideration was the fact that although plaintiff's expert Silverstein could explain the effect of the treatment, he admitted that it was "experimental," and that he had not become aware of it until plaintiff's counsel forwarded materials from this case for his review nor was he aware of any other physicians who were using the treatment.
However, this case presents the unusual circumstance where defendant's expert was not only the leading proponent of a rare treatment, but also the only physician to study its effects, and other than defendant, the only physician according to this record to have actually used the treatment. In that respect it would have been "impracticable" for plaintiff to "obtain facts or opinions" as to the actual use of the treatment on patients with postherpetic neuralgia by means other that King's deposition. R. 4:10-2(d)(3). Thus, King was not one of the "cottage industry" experts referred to in Graham, supra, he was the only other expert who had actually utilized the treatment. 126 N.J. at 373, 599 A.2d 149. Under these unusual *974 circumstances, we conclude the judge did not abuse his discretion in finding that plaintiff had established her burden of showing "exceptional circumstances" pursuant to R. 4:10-2(d)(3), and in admitting unredacted portions of King's deposition.
Additionally, the transcript was read to the jury without the jury being able to detect whose witness King had originally been, or differentiate between what had been direct examination by defendant's counsel and cross-examination by plaintiff's counsel. "Generally, when an expert formerly retained by a party is allowed to testify for an adverse party, he is restricted from mentioning the prior affiliation." General Motors Corp. v. Jackson, 636 So.2d 310, 314 (Miss. 1992), cert. denied, 513 U.S. 928, 115 S.Ct. 317, 130 L. Ed.2d 279 (1994). See also Graham, supra, 126 N.J. at 363, 599 A.2d 149 (stating that the trial court properly prohibited the expert from relying on any confidential information or suggesting that the adverse party had originally consulted him).
In reaching this unusual decision, the trial judge read the entire transcript of King's videotaped deposition. He redacted much of the testimony, including all portions of the deposition addressing the issue of informed consent. The judge also required that the admissible portions of the deposition be read to the jury without the jury being told whose witness King had originally been, and the jury was not advised which attorney had asked any particular question during the deposition. Even if the judge's decision was error, we conclude that in light of the overwhelming evidence that Kantha deviated from the standard of care in prescribing medication without explaining its use to plaintiff, that any error was not plain error requiring reversal of the judgment and a new trial.
[At the request of the Appellate Division, Points V through VIII do not merit publication, and therefore are omitted. In those points the court rejected all of defendant's contentions.]
Affirmed.
NOTES
[1] Shingles or herpes zoster is the "re-expression of the chicken-pox virus in a particular nerve or group of nerves." When the virus becomes active, it causes a reaction in the skin over the affected nerve endings, resulting in redness, swelling, blisters and pain.
[2] This defendant was voluntarily dismissed from the case prior to the first trial.
[3] Plaintiff's description of her pain was the subject of extensive cross-examination due to contradictory information which appeared on a questionnaire that had been completed at the Center prior to Kantha's initial examination on April 15, 1991.
[4] King also wrote an article which was published after this incident entitled, King, Topical Aspirin in Chloroform and the Relief of Pain due to Herpes Zoster and Postherpetic Neuralgia, Archives of Neurology, vol. 50, October 1993, p. 1046.
[5] No subsequent New Jersey cases have addressed the issue of what constitutes "exceptional circumstances," as defined under R. 4:10-2(d)(3), sufficient to allow a party to admit the expert opinion of his or her adversary's expert. See Stigliano by Stigliano v. Connaught Laboratories, Inc., 140 N.J. 305, 313, 658 A.2d 715 (1995) (holding that videotaped depositions of the plaintiff's treating physicians were admissible because the plaintiffs had consulted the doctors for treatment, not in anticipation of litigation or in preparation of trial); Spedick v. Murphy, 266 N.J.Super. 573, 592, 630 A.2d 355 (App.Div.) (holding that the defendant was permitted to call two physicians who were consulted by plaintiff for treatment, not in preparation for trial), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993).
[6] Fed.R.Civ.P. 26(b)(4)(B) provides that a party "may ... discover facts or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only... upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."