778 A.2d 1181 (2001)
343 N.J. Super. 511
Janet ADLER and Bruce Adler Plaintiffs,
v.
Peter L. SHELTON, Lee F. Mindel, Shelton, Mindel & Associates and Distaulo Bros. Construction Co., Inc., Defendants.
Superior Court of New Jersey, Law Division, Bergen County.
Decided April 9, 2001.
*1182 Robert A. Drucker (Peckar & Abramson, P.C.), River Edge, for plaintiffs Janet Adler and Bruce Adler.
Paul T. Fader (Connell Foley, L.L.P.), Roseland, for defendants Peter L. Shelton, Lee F. Mindel and Shelton Mindel & Associates.
Sheppard A. Guryan (Lasser Hochman, L.L.C.), Roseland, for defendants DiStaulo Bros. Construction Co., Inc.
WALSH, J.S.C.
This matter is before the court on a motion made by the defendants Peter L. Shelton ("Shelton"), Lee F. Mindel ("Mindel"), their architecture firm, Shelton, Mindel & Associates (collectively "Shelton Mindel"), and construction manager, Distaulo Bros. Construction Co. ("Distaulo") seeking discovery of a draft report, a facsimile transmittal sheet and seven (7) invoices prepared by Peter Franzese ("Franzese"), a structural engineer retained as an expert witness by the plaintiffs, Janet and Bruce Adler ("the Adlers"). These documents came to light during the deposition of a non-party witness, C.J. Diven ("Diven"). When the parties could not agree as to the discoverability of the draft report, the transmittal sheet, or the invoices, *1183 the court directed that these documents be forwarded under seal for its in camera review. The defendants were permitted to seek discovery of the documents through the present motion which the plaintiffs have resisted. The motion was returnable on March 30, 2001 and the court heard the parties at that time. For the reasons that follow, the court finds that these documents are not protected by the attorney work product doctrine and directs that they be produced.

I
The Adlers have sued Shelton Mindel and Distaulo for damages in connection with alleged deficiencies in the design and construction of their home in Alpine, New Jersey. The defendants contend that their activities at the Alpine site essentially ended when the Adlers occupied their home in October 1987 and certainly no later than March 1989, when the final Certificate of Occupancy was issued. A key issue in the case involves the question of when the statute of limitations period began to run. The Adlers contend that the serious structural flaws present in their home were not apparent and were only discovered years later. The defendants, on the other hand, argue that the claimed defects were apparent, thereby placing the Adlers on notice of their claims no later than the issuance of the final Certificate of Occupancy.
The Adlers turned to Diven in 1996 when they had a serious roof leak at their home. Diven was a general contractor and knew Bruce Adler through work done at his business. Diven began work on the roof and hired Franzese on behalf of the Adlers in February 1997 as it became apparent to him that there were potentially serious structural problems at the Adlers' home. Franzese determined that the Adlers' home was in imminent danger of collapse and ordered that temporary floor jacks be installed in the basement. Diven performed that task. Thereafter, Franzese designed repairs to address several of the serious structural problems he identified. According to the plaintiffs, the repairs, which were performed or supervised by Diven, addressed only the critical safety issues. The Adlers claim that the vast majority of repairs have yet to be made.
In March 1997, the Adlers retained Peckar & Abramson P.C. ("PA") to provide them with legal advice. Franzese was retained by PA shortly thereafter. On May 15, 1997 PA filed this action against the defendants. In connection with the lawsuit, Franzese authored an expert report entitled "Structural Condition Report for 23 Stone Tower Drive, Alpine, New Jersey" dated April 10, 1998.[1] This expert report was provided to the defendants.
Franzese was deposed on February 8 and 28, 2001. During the course of those depositions, Franzese confirmed that drafts of his expert report were probably prepared and forwarded to PA for comment. Franzese claimed that PA's review did not result in content changes in the report but may have resulted in changes taking place in the report's format and presentation. Franzese indicated that he no longer had these draft reports and his practice was generally to discard them after completion of his final report. Franzese further indicated to the defendants that he did not know whether PA kept these drafts. Franzese's February 8, 2001 testimony on these subjects was as follows:

*1184 Q. Do you have drafts of reports as well?
A. No.
....
Q. Do you ever do drafts?
A. Very possibly.
Q. What happened to the drafts? Are they back in your office as well?
A. No, I usually throw them out.
Q. You usually throw out the drafts?
A. Sure.
....
Q. How many drafts were there?
A. I have no idea.
Q. You don't know?
A. Don't know.
Q. Was the draft report reviewed by anyone other than yourself?
A. They were prepared by me, modified as information became involved for further review.
....
Q. Did Mr. Drucker or anyone from his firm review the drafts or any of the drafts?
A. No. The drafts are internal.
....
Q. Did Mr. Drucker or Mr. Johnson or anyone at Peckar & Abramson ever review any of the drafts that you prepared?
A. They may have reviewed a progress draft.
Q. Did you ever furnish anyone at Peckar & Abramson with drafts?
A. On an ongoing basis?
Q. At any point in time.
A. Yes. Maybe once or twice.
Q. Okay. As a result of anyone at Peckar & Abramson reviewing those drafts or draft were changes made?
A. Changes in the content, no. Changes in presentation and possibly format, in one or two instances maybe.
Q. Do you know whether or not Peckar & Abramson have those drafts in their files?
A. I have no idea.
Q. But you're sure you have no drafts?
A. I don't usually keep drafts.
Q. Why is that?
A. Because it just adds up to a lot of paperwork.
Deposition of Peter Franzese dated February 8, 2001 at 36-38.
Franzese was asked to search for any draft reports and to produce them at his subsequent deposition. That deposition took place on February 28, 2001 and Franzese reported that he no longer had any of the draft reports.
Diven was deposed on March 13, 2001. At the defendants' request, Diven brought his file concerning the work he had performed for the Adlers. Diven was represented by PA at this deposition. As the defendants' counsel began to examine Diven's file, they discovered that the file contained a draft report of Franzese dated July 30, 1997, a facsimile cover sheet to PA from Franzese which stated "Draft of condition report for your review. Photos not included. Call to discuss.", and seven (7) invoices for Franzese's services.[2] The defendants demanded these materials be produced but PA refused claiming the materials were attorney work product or otherwise undiscoverable materials. At that *1185 point the court was contacted and, as noted, the materials were provided under seal pending this motion.

II
PA claims that the draft report at issue here was sent to it at its request so that the firm's lawyers could learn about the case. The draft report and the facsimile forwarding it, in the view of PA, are protected from discovery by the attorney work product doctrine. But the draft report and the facsimile transmission sheet are not being sought from PA but rather from Diven, a non-party witness. The initial question then is whether a privilege can be asserted at all.
Diven apparently played an administrative role in coordinating payment for the various expenditures made by the Adlers and paid Franzese for his services both as an expert in this litigation as well as a contractor engaged to repair the Adlers' home.[3] Thus, they were regular correspondents. The draft report, according to PA and Diven, was sent to him in error by Franzese. The defendants do not appear to disagree with this explanation and the court accepts it for purposes of this motion. Accordingly, if the court determines that the draft report is protected under the attorney work product doctrine as claimed, the disclosure to Diven was inadvertent and would not serve to waive this privilege. Trilogy Communications, Inc. v. Excom Realty, Inc., 279 N.J.Super. 442, 652 A.2d 1273 (Law Div.1994)(attorney-client privilege is not lost where there was an inadvertent disclosure of privileged documents to the adversary during the course of discovery).

III
How then should this draft report and the facsimile transmission sheet fare under our discovery rules? The court starts with the proposition that "[o]ur discovery procedures should be liberally construed to compel production of all relevant, unprivileged information and information that may lead to the discovery of relevant evidence." Franklin v. Milner, 150 N.J.Super. 456, 465, 375 A.2d 1244 (App. Div.1977). R. 4:17-4(e) addresses the scope of expert discovery by requiring "an exact copy of the entire report or reports rendered by the expert...." be provided to an adversary. Further, the answering party is required to "certify to not knowing of the existence of other reports of that expert...." This addition is designed to "....prevent experts from preparing two reports, one intended for discovery and the other for so-called confidential use." Franklin v. Milner, 150 N.J.Super. at 470, 375 A.2d 1244.
The first question to be answered is whether the draft report here is an "other report[ ]" of that expert, thereby triggering the obligations under R. 4:17-4(e) to notify the adversary of the report's existence and if the report becomes known or available ".... serve[ ][it] promptly on the propounding party, but in no case later than ...." twenty (20) days prior to the trial date. The commentary to R. 4:17-4(e) appears to suggest that draft reports are not covered. It notes that:
Paragraph (e) of this rule was adopted effective September 1977.... The first two sentences of the rule were taken from former paragraph (a) of the rule and define the answering party's obligations with respect to furnishing the *1186 full reports received by him and all supplementary reports.
Sylvia B. Pressler, Current N.J. Court Rules, Comment to R. 4:17-4(e) at 1320 (Gann 2000)(Emphasis added). If it was the intent of the Rule's drafters to cover draft reports they surely would have said so. The absence of such commentary is particularly telling when the comments to R. 4:17(e) use the words "full" and "supplementary" rather than "draft" to describe the reports covered by R. 4:17-4(e).
One legal commentator familiar with New Jersey's Civil Practice Rules, however, has suggested that the existence of the "draft" reports of experts may have to be identified as part of the R. 4:17-4(e) certifying process.[4] It is significant, however, that this commentator takes no position on whether "draft" reports are discoverable under R. 4:17-4(e):
If, in fact, draft written and oral reports are discoverable, then this rule makes more senseexcept to question why the rules carve out this one area of discovery for mandatory disclosure as opposed to leaving counsel to their discovery wits. If, on the other hand, drafts are not discoverable, then any basis for the rule disappears. And, while it may be legitimate public policy to protect against attorneys' manipulation of expert reports, it may be the greater public interest to protect the interchange of ideas between counsel and his or her expertsubject, as always, to the general ability to discover discussions and reports, if properly requested. It is, therefore, essential that the appropriate Supreme Court committee address and resolve this issue by clarifying whatever was in fact intended.
S. Robert Allcorn, "Draft" Dodging: Don't Destroy Those Early Expert Reports, 148 N.J.L.J. 1377 (June 30, 1997).
This court finds that R. 4:17-4(e) was intended to address new or supplemental reports prepared by experts expected to testify in the case or reports provided to counsel for confidential use as was suggested by the Appellate Division in Franklin v. Milner, 150 N.J.Super. at 470, 375 A.2d 1244. In the words of that court, the certification process contained in the predecessor to R. 4:17-4(e) was intended to correct abuses where a proposed expert had provided counsel with an oral report but that attorney had failed to provide it to the adversary. Franklin v. Milner, 150 N.J.Super. at 469-470, 375 A.2d 1244, citing Clark v. Fog Contracting Co., 125 N.J.Super. 159, 309 A.2d 617 (App.Div.), certif. denied, 64 N.J. 319, 315 A.2d 408 (1973). It was not intended to mandate the identification or production of draft reports. Therefore, the court must turn to the broader question of whether the New Jersey Civil Practice Rules require the production of draft reports produced by experts expected to testify at trial.

IV
New Jersey's Civil Practice Rules, like the Federal Rules of Civil Procedure upon which they are based, struggle to insure adequate discovery of information considered, or at least relied upon, by experts expected to testify. At the same time, they seek to provide protection to attorneys so that the adversarial system will *1187 function efficiently. The interactions between attorneys and the experts implicate both these objectives. Of course, it is true that sometimes a single expert will be employed as both a witness and advisor.
Our courts recognize that an expert may serve in such a dual capacity during the course of litigationappearing at trial as an expert witness and at the same time providing expert advice to the trial attorney. Graham v. Gielchinsky, 126 N.J. 361, 373, 599 A.2d 149 (1991); Franklin v. Milner, 150 N.J.Super. at 471, 375 A.2d 1244. As a testifying expert, the witness must supply in discovery "the substance of the facts and opinions to which ...[he or she] is expected to testify and a summary of the grounds for each opinion...." R. 4:10-2(d)(1). At the same time our rules recognize that the attorney retaining the expert as a trial witness also may need access to specialized knowledge in order to adequately represent his or her client. Bank Brussels Lambert v. Chase Manhattan Bank, 175 F.R.D. 34, 43-44 (S.D.N.Y. 1997); In re Shell Oil Refinery, 132 F.R.D. 437, 440-441 (E.D.La.1990); see also Coyle v. Estate of Simon, 247 N.J.Super. 277, 284-285, 588 A.2d 1293 (App.Div.1991). R. 4:10-2(d)(3) furthers that objective by shielding "facts known or opinions held" by a non-testifying expert retained by an attorney from disclosure in the absence of exceptional circumstances.
The importance of attorney work product in the litigation process is also recognized. R. 4:10-2(c) protects information gathered by an attorney from discovery in the absence of a substantial need for disclosure. Even when disclosure is necessary, R. 4:10-2(c) requires courts to protect the mental impressions and thought processes of lawyersso-called "opinion" work product. The policy reason behind the rule, of course, is to protect the essence of the adversarial process upon which our legal system is based. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see generally Comment, Michael E. Plunkett, Discoverability of Attorney Work Product Reviewed by Expert Witnesses: Have the 1993 Revisions to the Federal Rules of Civil Procedure Changed Anything?, 69 Temp. L.Rev. 451 (1996).
Much of the legal discussion concerning the applicability of the attorney work product doctrine to the interaction between experts and the attorneys that hire them has occurred where information has been given to the expert by the attorney and discovery of that information is later sought by an adversary. See Stephen D. Easton, Ammunition for the Shoot-out with the Hired Gun's Hired Gun: A Proposal for Full Expert Witness Disclosure, 32 Ariz. St. L.Rev. 465, 528-544 (2000); Note, Christa L. Klopfenstein, Discoverability of Opinion Work Product Materials Provided to Testifying Experts, 32 Ind. L.Rev. 481 (1999); Comment, Michael E. Plunkett, Discoverability of Attorney Work Product Reviewed by Expert Witnesses: Have the 1993 Revisions to the Federal Rules of Civil Procedure Changed Anything?, 69 Temp. L.Rev. 451 (1996). This situation has frequently been reported in federal court decisions. No New Jersey court decision has addressed this issue. Since R. 4:10-2(d) is a carbon copy of Fed.R.Civ.P. 26(b)(3) it is appropriate to look to federal decisions for guidance. Brown v. Brown, 86 N.J. 565, 581-582, 432 A.2d 493 (1981).
Review of the federal cases, both prior and subsequent to the 1993 amendment to Fed.R.Civ.P. 26, show that the federal courts are not uniform in their treatment of the attorney work product doctrine and its impact on expert discovery. A number of decisions have zealously protected "opinion" attorney work product even when documents containing such information *1188 have been provided to a testifying expert. Other federal decisions, particularly after the 1993 amendments to Fed. R.Civ.P. 26, have favored disclosure of even "opinion" attorney work product where it has been provided to the expert. Those decisions have reasoned that the adversary is entitled to examine anything which the expert may have considered in rendering his or her opinion.
In Bogosian v. Gulf Oil Corp., 738 F.2d 587 (3d Cir.1984), for example, the Third Circuit considered the applicability of the attorney work product doctrine to materials an attorney provided to an expert in an antitrust class action. The materials included 115 documents alleged to contain both "fact" and "opinion" attorney work product. The Court of Appeals reversed a trial court's direction that all work product materials shown to the testifying expert should be disclosed. In doing so, the court stressed the interaction of then existing Fed.R.Civ.P. 26(b)(3) & (4) on attorney work product issues.[5] Fed.R.Civ.P. 26(b)(3) does permit discovery of testifying experts "subject to the provisions of.... [Fed.R.Civ.P. 26(b)(4)]...." Fed.R.Civ.P. 26(b)(4) at that time permitted the discovery through interrogatories of facts known and opinions held by testifying experts. According to the Third Circuit, when these two sub-parts of Fed.R.Civ.P. 26 are read together, the provision in Fed.R.Civ.P. 26(b)(3) which requires a court to "....protect against disclosure of the mental impressions, conclusions, opinions or legal theories of ....[the] attorney", trumps the disclosure requirements of Fed.R.Civ.P. 26(b)(4). Id. at 595. Mental impressions of the lawyer-so-called "opinion" work productcannot be discovered, according to the Third Circuit, even when provided to a testifying expert by the attorney that had retained him or her.
The Third Circuit reinforced its rule construction analysis with a policy observation that has force today:
Examination and cross-examination of the expert can be comprehensive and effective on the relevant issue of the basis for an expert's opinion without an inquiry into the lawyer's role in assisting with the formulation of the theory. Even if examination into the lawyer's role is permissible, an issue not before us, the marginal value in the revelation on cross-examination that the expert's view may have originated with an attorney's opinion or theory does not warrant overriding the strong public policy against the disclosure of documents consisting of core attorney's work product.
Bogosian, 738 F.2d at 595. Many courts have embraced the reasoning of the Bogosian court and have denied discovery of so-called "opinion" work product in similar circumstances. See Toledo Edison Co. v. GA Techs., Inc., 847 F.2d 335, 340 (6th Cir.1988); Hamel v. General Motors Corp., 128 F.R.D. 281, 282-283 (D.Kan. 1989); North Carolina Elec. Membership *1189 Corp. v. Carolina Power & Light Co., 108 F.R.D. 283, 286 (M.D.N.C.1985).
Other federal courts, however, have disagreed with the Bogosian Court's view that a lawyer's role in assisting an expert in formulating his or her opinions has marginal value as cross-examination material. This contrary view is exemplified by Intermedics, Inc. v. Ventritex, Inc., 139 F.R.D. 384, 393-384 (N.D.Cal.1991). That court acknowledged that communications between an attorney and an expert might well accelerate an expert's .... "learning". However, the court warned that this "learning" might be obtained "... at an extremely high price."
What obviously is threatened by such communications is the independence of the expert's thinking, both her analysis and her conclusions. The risk is that the lawyer will do the thinking for the expert, or, more subtly, that the expert will be influenced, perhaps appreciably, by the way the lawyer presents or discusses the information. These risks would be eliminated if only the data were presented to the expert. The risk would be reduced, arguably considerably, if it were known that all communications from counsel that accompany the transmission of data (and that are relevant to the matters about which the expert will testify) would be reviewable by other experts (retained by opposing parties or appointed by the court) and made known to the trier of fact.
Intermedics, 139 F.R.D. at 394.
The Intermedics Court determined that except in unusual circumstances all information provided to an expert by the attorney whether "opinion" work product or otherwise, should be produced to the litigation adversary. Other courts have agreed with the rationale for discovery expressed in Intermedics. See U.S. Energy Corp. v. NUKEM, Inc., 163 F.R.D. 344, 348 (D.Colo.1995)(decided under pre-1993 Rule 26); United States v. City of Torrance, 163 F.R.D. 590, 593 (C.D.Cal. 1995)(same); William Penn Life Assur. Co. of Am. v. Brown Transfer & Storage Co., 141 F.R.D. 142, 143 (W.D.Mo.1990); Boring v. Keller, 97 F.R.D. 404, 407 (D.Colo.1983).
In 1993 the Federal Rules of Civil Procedure were amended, among other things, to require the provision of expert reports and to permit depositions of experts as a matter of right in federal cases. Fed.R.Civ.P. 26(a)(2)(B), in relevant part, now provides:
... [required disclosure of experts] with respect to a witness who is retained or specially employed to provide expert testimony in the case ... [shall] be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions ...
A number of courts have argued that the 1993 revision of Fed.R.Civ.P. 26 has changed the dynamics of discovery. Those courts have found it significant that Fed. R.Civ.P. 26(a)(2)(B) now requires the production of information considered rather than simply the facts and data relied upon and have concluded that the Rule now embraces "opinion" work product provided by an attorney to an expert. B.C.F. Oil Refining, Inc. v. Consolidated Edison Co. of N.Y., Inc., 171 F.R.D. 57, 66 (S.D.N.Y. 1997); Karn v. Ingersoll-Rand Co., 168 F.R.D. 633, 639 (N.D.Ind.1996). But an equal number of federal courts have rejected this conclusion and have continued to support the protection of "opinion" attorney work product. The Nexxus Products Co. v. CVS New York, Inc., 188 F.R.D. 7, 9 (D.Mass.1999); Magee v. Paul Revere Life Ins. Co., 172 F.R.D. 627, 642-643 *1190 (E.D.N.Y.1997); Haworth, Inc. v. Herman Miller, Inc., 162 F.R.D. 289, 294-295 (W.D.Mich.1995); All West Pet Supply Co. v. Hill's Pet Prod., 152 F.R.D. 634, 638 (D.Kan.1993).[6]
While the federal cases remain in conflict, they plainly highlight the competing discovery policies in play here. The defendants insist that Franzese's draft report is the type of information the New Jersey Civil Practice Rules anticipate will be produced. PA, on the other hand, complains that the draft would have been destroyed as part of Franzese's routine practice but for PA's request for this preliminary information. PA's request, according to it, had the unnatural effect of preserving a document which otherwise would be unavailable to the defendants.
PA's argument has merit in the abstract. There are important policies which are furthered where a discovery regime permits attorneys to shield communications with their retained experts when the attorneys are not conveying facts and/or data for the experts to "consider" in forming their opinions. The Nexxus Products Co. v. CVS New York, Inc., 188 F.R.D. at 11. Litigation is expensive. Attorneys, by focusing an expert's attention on the significant issues in the case, unquestionably can improve the expert's learning curve and lessen litigation costs. Krisa v. The Equitable Life Assur. Soc., 196 F.R.D. 254, 259 (M.D.Pa.2000). It is common knowledge that attorneys regularly work with their retained experts in preparing expert reports. It is good practice as well. Moore v. R.J. Reynolds Tobacco Co., 194 F.R.D. 659, 662 n. 3 (S.D.Iowa 2000)( the court quoted the Advisory Committee's Note to Fed.R.Civ.P. 26(a)(2)(B) stating that counsel could assist an expert in preparing his or her report). See Note, Christa L. Klopfenstein, Discoverability of Opinion Work Product Materials Provided to Testifying Experts, 32 Ind. L.Rev. 481, 503 (1999). Too much scrutiny of this collaborative process serves only to demonize the natural communicative process between an attorney and his or her retained expert. Ultimately, it does little to insure that the expert's opinion has been independently derived.[7] As the court in Nexxus Products, 188 F.R.D. at 10, aptly observed:
The central inquiry on cross examination of an expert witness.... is not the question of if and to what extent the expert was influenced by counsel; rather it is this: what is the basis of the expert's opinion. Cross examination on the adequacy and reliability of the stated basis of the expert's opinion can be *1191 conducted effectively absent a line of questioning on counsel's role in assisting the expert.
See also All West Pet Supply, 152 F.R.D. at 638 n. 6.

V
No New Jersey case has discussed the discoverability of draft expert reports. Again, since our expert discovery scheme closely resembles the federal model, the court turns to federal decisions on this question.
Like the general debate on "opinion" attorney work product, the federal courts disagree about the discoverability of draft expert reports. Compare Krisa, 196 F.R.D. at 256-257 (directing production of draft reports); B.C.F. Oil Refining, 171 F.R.D. at 62 (same); County of Suffolk v. Long Island Lighting Co., 122 F.R.D. 120, 122 (E.D.N.Y.1997) ("courts have defined the scope of ... [Fed.R.Civ.P. 26(b)(4)] to allow `disclosure of drafts of reports or memoranda experts have generated as they develop the opinions they will present at trial.'"); Hewlett-Packard Company v. Bausch & Lomb, Inc., 116 F.R.D. 533, 536-537 (N.D.Cal.1987)(draft reports prepared in advance of submission of report filed with the Patent and Trademark Office were discoverable); Quadrini v. Sikorsky Aircraft, 74 F.R.D. 594 (D.Conn. 1977) (draft expert reports discoverable), with The Nexxus Products Co. v. CVS New York, Inc., 188 F.R.D. at 10-11 (draft expert reports not discoverable because they are a type of opinion work product); Moore v. R.J. Reynolds Tobacco, Co., 194 F.R.D. at 662 (same). While there is disagreement as to whether draft expert reports are discoverable, a clear majority of the federal courts considering this question have found that they are.
Courts that have directed the production of draft expert reports have done so because Fed.R.Civ.P. 26(a)(2)(B) requires the production of "the data or other information considered by ..." an expert in forming his or her opinions. Prior to 1993, Fed.R.Civ.P. 26(b)(4) also provided for discovery of facts relied upon in expressing opinions. As the Advisory Committee Note to the 1970 Amendments to Rule 26(b)(4) of the Federal Rules of Civil Procedure notes:
These new provisions of subdivision (b)(4) repudiate the few decisions that have held an expert's information privileged simply because of his status as an expert. They also reject as ill-considered the decisions which have sought to bring expert information within the work product doctrine.
Fed.R.Civ.P.26 (b)(4) advisory committee's note (citing American Oil Co. v. Pennsylvania Petroleum Products Co., 23 F.R.D. 680, 685-686 (D.R.I.1959); United States v. McKay, 372 F.2d 174, 176-177 (5th Cir. 1967)).
Thus the structure of and commentary to the old Fed.R.Civ.P. 26(b)(4) suggested "that documents prepared by expert witnesses are not within the ambit of the work product doctrine." Krisa, 196 F.R.D. at 256. Courts also have reasoned that the policy favoring protection from discovery of opinions held by non-testifying experts do not apply to an expert expected to testify at trial. Krisa at 256; B.C.F. Oil Refining, 171 F.R.D. at 62. Finally, courts have favored such production where technical issues make pretrial preparation particularly important. Hewlett-Packard, 116 F.R.D. at 537.
The cases that have denied discovery of draft expert reports have based their decisions on the need to encourage a close and collaborative effort between the expert and the retaining attorney. See Nexxus Products, 188 F.R.D. at 10-11. Moreover, these courts believe that a blanket rule requiring disclosure of such draft reports puts too prominent a focus on the mechanics *1192 of the production of an expert's report rather than focusing on the basis of the expert's opinion. All West Pet Supply, 152 F.R.D. at 638 n. 6.
These courts have common sense on their side. Experts familiar with the litigation process usually destroy their draft reports and the rules do not forbid this. Thus draft reports usually are available only from the unwary or careless expert or in odd circumstances like the present case.

VI
As this court sees it, neither federal or state rules provide a clear cut answer to whether draft reports need be produced or whether they can be protected in any case. The decision is dependent on the circumstances present in the individual case.
Here the facts plainly favor the draft report's production. PA played no role in the preparation of the draft. The law firm provided no information to the expert at least as far as the record before the court indicates. Even if it had, there is nothing before the court to suggest that PA had shared any of its "opinion" work product with Franzese. Certainly this material was not identified nor was it clearly contained in the draft report. There is not even evidence that the draft report was produced as a result of collaborative efforts between PA and Franzese. There certainly is no dispute between the parties, nor could there be one, about the need to provide information about the facts the expert considered, or at least relied upon, for his opinion here. Consequently, the court directs the disclosure of Franzese's draft report forthwith.
The facsimile transmission sheet should also be disclosed. An argument can be constructed that R. 4:10-2 and 4:17-4(e) do not cover such documents because they are not relied upon or even considered by an expert such as Franzese in forming his opinions. While that may be the case, R. 4:10-2 provides that discovery is quite broad and, as already noted, this document was in the hands of Diven, a non-party witness. See Krisa, 196 F.R.D. at 261 (cover letters to and from expert witnesses are discoverable under general discovery provisions of Fed.R.Civ.P. 26(b)(1)).

VII
The Adlers also have resisted producing seven (7) invoices from Franzese which they claim reflect his fees and expenses for services rendered to PA in connection with the ongoing litigation. The court has reviewed these invoices and they appear to contain no description of his services the only arguable concern here. Plainly the number of hours spent in his expert capacity as well as the monies received by Franzese are legitimate areas of inquiry. The Adlers note that these invoices are not directly discoverable under the expert discovery rules and they are right. B.C.F. Oil Refining, 171 F.R.D. at 61 (invoices are not covered under Fed. R.Civ.P. 26(a)(2)(B)). Nevertheless, the invoices are clearly relevant, contain no attorney work product, and are in the hands of a third party witness. R. 4:10-2 The court directs that these invoices also be turned over forthwith.

VIII
For the reasons stated in this opinion, the court finds that none of the documents submitted to it in camera are entitled to protection and therefore they must be produced. Since this decision will have the effect of extinguishing any privileges which might exist, the enclosed Order by its terms contains a short stay so that PA and the Adlers, should they choose, may seek further relief in the Appellate Division. The short stay period recognizes that the *1193 matter is scheduled for a Lopez hearing on April 19, 2001.
NOTES
[1] Franzese's Report has two (2) addenda. The first is dated September 9, 1999 and substitutes revised photograph location plans in order to conform the photograph locations to the report text. The second is dated May 11, 2000 and makes observations with respect to the master bedroom and bath.
[2] During oral argument on March 30, 2001 the court indicated that it might withhold the facsimile transmittal sheet from Franzese to PA on attorney work product grounds. On reflection, the court believes that the transmittal from Franzese to PA should not be protected from discovery. In any case, the court notes that PA repeats virtually the entire content of the transmittal in its Brief filed with the court.
[3] PA claims it retained Franzese for this litigation but to simplify matters told the Adlers to make payments directly to Franzese for the expert services rendered. The Adlers, however and contrary to PA's instructions, continued to use Divens as a clearinghouse for all payments made to Franzese both litigation and construction related.
[4] See S. Robert Allcorn, "Draft" Dodging: Don't Destroy Those Early Expert Reports, 148 N.J.L.J. 1377 (June 30, 1997). The commentator suggests that the question of whether "draft" reports are subject to R. 4:17-4(e) is of real importance to the bar because of the ethical implications of providing an incomplete or evasive answer. The court agrees that the Rule should be clarified so it makes clear what an attorney's obligation is with respect to a "draft" report.
[5] Fed.R.Civ.P. 26(b)(3) provided:

Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative or a party concerning the litigation.
[6] In All West Pet Supply, 152 F.R.D. at 638-639, for example, the court endorsed the discovery philosophy espoused by Bogosian, finding that:

the defendants in this case has (sic) demonstrated little more than a speculative need for the documents. At most, the defendants contend that the attorney's work product shaped the expert's opinion on the plaintiff's damages in this case. This is not a sufficient showing to overcome the strong policy against disclosure of opinion work product.
[7] Of course one can find rare but nonetheless serious abuses reported in the cases. This strengthens the argument that the factfinder should focus its attention on how the expert's report was prepared. In Occulto v. Adamar of New Jersey, Inc., 125 F.R.D. 611, 616-617 (D.N.J.1989), for example, the court directed disclosure of a draft report which had been written entirely by the attorney as well as a cover letter directing the expert to type the draft report on his letterhead. The court there found that the draft was nothing more than factual material which should be available to the factfinder. The court also noted that the draft had particular relevance because when it was initially discovered at a deposition of the expert, the attorney initially denied having any role in the report's authorship.