768 A.2d 274 (2000)
338 N.J. Super. 176
In re NAPP TECHNOLOGIES, INC. LITIGATION
Application Of Holt & Ross, Inc. To Quash Subpoena.
Superior Court of New Jersey, Law Division, Bergen County.
Decided October 4, 2000.
*276 Louis Pashman, Hackensack, of Pashman Stein appearing on behalf of a non-party witness Holt & Ross, Inc.
Martis Ann Brachtl, New York City, of Goodkind, Labaton, Rudoff & Sucharow, LLP; and Mark S. Shane, Esq., appearing on behalf of plaintiffs Katharine Christiano, et al.
Michael Dore, and Rosemary E. Ramsey, of Lowenstein Sandler, appearing on behalf defendant-third party plaintiff Napp Technologies, Inc.
Robin L. Main, Providence, RI, of McGovern, Noel & Benik; and Edward Seaver, Newark, of Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, appearing on behalf of defendant Technic, Inc.
William P. Reis of Purcell, Reis, Shannon, Mulcahy & O'Neill, appearing on behalf of defendant Patterson-Kelley, Co., a Division of Harsco Corporation.
*275 WALSH, J.S.C.
This matter is before the Court by way of an appeal from a recommendation and ruling by the Special Master serving in these consolidated actions quashing a subpoena served on nonparty witness Holt & Ross, Inc. ("H & R"). The subpoena was issued at the request of Technic, Inc. ("Technic") and seeks testimony and documents relating to work performed by H & R, a public relations firm for Napp Technologies, Inc. ("Napp"). For the reasons set forth in this opinion, the Court declines to follow the Special Master's recommendation and ruling. Accordingly, H & R's motion to quash the subpoena is denied.

I
In October 1995, H & R distributed two press statements on behalf of Napp. These press statements dealt with an investigation Napp purportedly conducted into the causes of an explosion which had occurred at its chemical plant in Lodi, New Jersey on April 21, 1995. That explosion led to the death of five Napp employees and the injury of numerous others. It caused blast damage virtually destroying the Napp plant, showering flaming debris on the surrounding neighborhood, releasing large quantities of toxic gases as well as smoke and fumes into the atmosphere, and causing widespread harm to people and property in the plant's vicinity. In the wake of this explosion, hundreds of lawsuits were instituted on behalf of employees working at the plant and individuals and businesses in the plant's vicinity.[1]
H & R was apparently retained by Napp shortly after the explosion and thereafter helped to author and distribute the two press statements. The first was styled "Napp Technologies, Inc. Responds to OSHA Citations" ("Napp Response") and was dated October 23, 1995. It discussed the accident and implicated Technic and Patterson-Kelley Co., a Division of Harsco Corporation ("Patterson-Kelley") as responsible parties.[2] The Napp Response *277 referred to "a detailed statement ... [in which] Napp reported the results of its own investigation of the events that preceded the explosion." That report entitled "Status Report Regarding Napp Technologies' April 21, 1995 Explosion" ("Explosion Report") was published and distributed by H & R on behalf of Napp that same day. The Explosion Report was signed by Napp and accused Technic of failing to provide adequate information to Napp about the explosive potential presented by the combination of the chemicals Napp was blending for Technic. The Explosion Report asserted that:
At present, the Material Safety Data Sheet for this material ... [provided by Technic] addresses the risk of fire but does not disclose the risk of catastrophic decompositions or explosion and particularly does not disclose the risk of the unique type of event that apparently occurred at the Napp facility on April 21, 1995. This is so despite the fact that Napp has since learned that an explosion injuring four workers had occurred when this same Technic product was blended at a facility in Waterbury, Connecticut in 1980.
Napp also faulted Patterson-Kelley for the accident. Napp noted that its investigation indicated that a mechanical seal on the PK-125 had failed thus permitting water which was used to cool moving parts in the blender to enter the mixing chamber where it then came in contact with the water reactive chemicals being blended. This, according to Napp, caused the explosion and its disastrous consequences.
As the consolidated lawsuits proceeded, on September 9, 1999 Technic directed a subpoena to the records custodian at H & R. The subpoena sought ten (10) categories of documents related to the Napp Response and Explosion Report as well as communications and interviews H & R had with: Napp; its managers and employees; the experts retained by the company in connection with the consolidated lawsuits; and, the involved governmental agencies.
On October 15, 1999, H & R sought to quash the subpoena claiming protection from compelled disclosure under the newsperson's privilege established by the New Jersey Shield Law. N.J.S.A. 2A:84A-21 to 21.8. H & R argued that it is a member of the news media because it regularly disseminates information to the public regarding newsworthy events. It also asserted that the materials sought in the subpoena were privileged because they were obtained during the course of H & R's professional activities and included source material and research as well as documents related to its confidential business strategy for disseminating information, including the specific strategy used by it to advise Napp. Finally, H & R argued that the information sought from it was either publicly available or available through the discovery process from the parties in the litigation or from others.
Technic responded to this motion by seeking to depose a representative of H & R concerning the nature of its business and the services rendered to Napp in order to test its assertion of the newsperson's privilege. Technic also sought advertisements, promotional brochures, literature and other materials distributed to potential clients through which H & R promoted its services. But H & R resisted these efforts, claiming that the newsperson's privilege is absolute absent *278 a conflicting constitutional right to such information. See Maressa v. New Jersey Monthly, 89 N.J. 176, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct 211, 74 L.Ed.2d 169 (1982). The Special Master denied these discovery requests finding that the New Jersey Shield Law, N.J.S.A. 2A:84A-21.2c anticipated only discovery sought by criminal defendants. The denial was contained in a Recommendation/Ruling dated November 24, 1999.
H & R seeks to establish its prima facie entitlement to the newsperson's privilege through a Certification dated October 13, 1999 and filed by Jonathan T. Holt ("Holt"), one of H & R's principals. The Holt Certification asserts that H & R "is retained by clients to provide counseling and expert advice regarding the most effective way for clients to comment publicly and/or state their positions publicly concerning news events .... After sufficient information has been gathered, Holt & Ross evaluates the information and then advises the best way in which to proceed in disseminating the ... [client's] position on the news event to the general public or to particular segments of the public such as business or industry information sources." H & R concedes that it "... disseminated... [the two press statements in issue] to the public on behalf of Napp."
Technic challenges H & R's claim that it is part of the news media. Rather, according to Technic, H & R advertises on its web site that it is in the business of "reputation management, public acceptance of controversial facilities, relationship building, crisis communications and conflict management." Plainly, these are not the tasks generally engaged in by traditional members of the media.

II
The New Jersey Shield Law, N.J.S.A. 2A:84A-21 to 21.8 published as N.J.R. Evid. 508 provides the basis for the newsperson's privilege:
Subject to Rule 37 [Rule 530], a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.
a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
As noted in Maressa v. New Jersey Monthly, 89 N.J. at 184, 445 A.2d 376, "[t]he newsperson's privilege in New Jersey dates from a 1933 statute ..." and "... [l]ike other evidentiary privileges, it limits the common law right to compel testimony in judicial proceedings. The Legislature enacts such privileges `because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure.'" Id. at 184, 445 A.2d 376. The New Jersey Supreme Court has determined that the legislative intent in enacting the New Jersey Shield Law was "to protect the confidential sources of the press as well as information so obtained by reporters and other news media representatives to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey." In re Farber, 78 N.J. 259, 270, 394 A.2d 330, cert. denied sub nom., New York Times *279 Co. v. New Jersey, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).
N.J.R. Evid. 508(e) requires that H & R: "... [m]ake a prima facie showing that he is engaged in, connected with, or employed by a news media ..."[3] The court finds that H & R has not made a prima facie showing that it fits within the definition of a newsperson and therefore is not entitled to the protections afforded by the New Jersey Shield Law.
No court has been asked to decide whether a public relations firm hired to manage adverse publicity surrounding an event that has ensnared its client in litigation may claim the status of newsperson for purposes of shielding it from its obligation to respond to a subpoena. H & R points out that in the past, New Jersey has broadly construed the New Jersey Shield Law to protect nontraditional news media, and that is true.
For example, the Appellate Division shielded a Spanish language tabloid from responding to a Grand Jury subpoena. See In re Avila, 206 N.J.Super. 61, 63-64, 501 A.2d 1018 (App.Div. 1985). There the publication was distributed without charge and was not entered as second-class matter at the United States Post Office two criteria for the publication to satisfy the statutory definition of "Newspaper" under the New Jersey Shield Law. N.J.R. Evid. 508(b)c. Nevertheless, the Appellate Division found the publication was "`similar' enough to a `newspaper'" to qualify under the statute observing that:
[W]e must be sensitive to the legislative momentum that has steadily expanded the scope of the statutory newsperson's privilege since its first enactment... Our Supreme Court has declared that the scope of its present protection is "the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey."
Twenty-five thousand copies of Avance are published weekly and distributed free at newsstands and at other places of business in north Hudson County. Avila has been a bona fide journalist in this country since 1965, shortly after his arrival here from Cuba, and has published Avance weekly since 1973. The paper is supported entirely by its advertisers.
In re Avila, 206 N.J.Super. at 63, 501 A.2d 1018 (Citations omitted).
Further, the Court agrees that the New Jersey Shield Law, offers its protection even where publications are directed to a limited audience. In the Matter of Petition of Burnett, 269 N.J.Super. 493, 635 A.2d 1019 (Law Div.1993). There the trial court quashed a subpoena served on A.M. Best Company, a publisher of trade journals dealing with the financial condition of companies in the insurance industry. Despite the fact that the published information was not directed to the general public but rather to members of the insurance trade, the newsperson's privilege was upheld. Id. at 497, 635 A.2d 1019. The court there noted that the reportage of news is what triggers the protection of the New Jersey Shield Law and this includes "any and all information which is gathered and disseminated to the public." Id. at 500-501, 635 A.2d 1019.
However, a generous interpretation of the New Jersey Shield Law to protect nontraditional publications is not what is sought here. Rather, H & R claims that it is part of the news media as those terms are defined in the New Jersey Shield Law. *280 To test that assertion, the court looks to the New Jersey Shield Law, In doing so, the court must use the standard tools of statutory construction.
The New Jersey Supreme Court has "emphasized repeatedly that when interpreting a statute, an overriding goal must be to determine the Legislature's intent." Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 231, 708 A.2d 401 (1998), quoting State, Department of Law & Pub. Safety v. Gonzalez, 142 N.J. 618, 627, 667 A.2d 684 (1995). "Ordinarily, the language of the statute is the surest indicator of the Legislature's intent." Cornblatt v. Barow, 153 N.J. at 231, 708 A.2d 401, citing Strasenburgh v. Straubmuller, 146 N.J. 527, 539, 683 A.2d 818 (1996). "If the language is plain and clearly reveals the intent of the statute, the court's sole function is to enforce the statute in accordance with those terms." State, Department of Law & Pub. Safety v. Bigham, 119 N.J. 646, 651, 575 A.2d 868 (1990).
As presently constituted, the newsperson's privilege only extends to "a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public ...." N.J.R. Evid. 508(a). "News media" is defined in the statute as "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public." N.J.R. Evid. 508(b)a. The New Jersey Shield Law, in turn, defines "News", "Newspaper", "Magazine", "News Agency", "Press Association" and "Wire Service". These definitions make it clear that the Legislature was concerned with protecting entities generally viewed as part of the news gathering apparatus in the United States.
H & R seeks to insinuate itself into one of these recognized parts of the news media. The Special Master agreed with H & R's thinking that it was appropriate "to analogize the functions of a press agent or public relations firm to `stringers' or freelance reporters, who are not employees of a news medium and whose connection with a particular news organization may be sporadic." Recommendation and Report dated July 29, 2000 at 15-16. This court does not agree.
Freelance reporters and public relations firms are worlds apart. Freelance reporters, though not directly employed by the news media, are clearly "connected with" them. Public relations firms, on the other hand, are retained by persons or entities which are subjects of the news. Such firms advise their clients on how to respond to news events that engulf them. As Jonathan T. Holt, H & R's principal, put it, public relation firms are "retained by clients to provide counseling and expert advice regarding the most effective way for clients to comment publicly and/or state their positions publicly concerning news events."
A public relations firm is neither part of the traditional or nontraditional news media. It also does not fit within any of the constituents of the "news media" as those terms are defined in the New Jersey Shield Law. As a representative for the client, the public relations firm is in effect its spokesperson. As such, the public relations firm really is part of the news rather than a member of the news media reporting it.
Moreover, a public relations firm after gathering information on such news events may well advise its client not to disseminate it. In other instances the public relations firm may be directed by the client not to disseminate the information. Simply stated, when a public relations firm such as H & R gathers information in connection with events like the explosion at Napp's plant facility, its intent at the time of gathering is not necessarily to distribute it. The public relations firm's main responsibility is to counsel its client and to provide it with expert advice regarding *281 public relations. That is the reason why it gathers information in the first place. Dissemination of such information, of course, is one potential outcome but the decision to do so is made after the fact and then only after the firm's client approves the dissemination. In short, the intent of the public relations firm often is to manage the news rather than to disseminate it.
The newsperson's privilege, however, protects only "news or information obtained in the course of pursuing... [a reporter's] professional activities whether or not it is disseminated." In that regard, N.J.R. Evid. 508(b)h provides:
"In the course of pursuing his professional activities" means any situation including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public. (Emphasis added)
As the court has already observed, H & R not only fails to qualify as a member of the news media, but also fails to satisfy a key requirement of the New Jersey Shield Law necessary to activate the newsperson's privilege. At the time, H & R gathered the information it did not do so "for the purpose of disseminating it to the public...." Thus H & R cannot invoke provisions of the New Jersey Shield Law, N.J.S.A. 2A:84A-21 et seq., to insulate it from disclosure in these consolidated civil actions.

III
But that does not conclude the privilege inquiry here. In the wake of the United States Supreme Court decision in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), most of the federal circuit courts have recognized the existence of a qualified privilege for newspersons based on the First Amendment to the United States Constitution. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 595-96 (1st Cir.1980); United States v. Burke, 700 F.2d 70, 77 (2d Cir.), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); United States v. Cuthbertson, 630 F.2d 139, 147 (3d Cir. 1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); LaRouche v. National Broadcasting Co. Inc., 780 F.2d 1134, 1139 (4th Cir.) cert denied, 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); Miller v. Transamerican Press Inc., 621 F.2d 721, 725 (5th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); Cervantes v. Time, Inc., 464 F.2d 986, 992-993 (8th Cir.1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); Farr v. Pitchess, 522 F.2d 464, 467-468 (9th Cir.1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 436-437 (10th Cir.1977); Zerilli v. Smith, 656 F.2d 705, 714 (D.C.Cir.1981). But see United States v. Smith, 135 F.3d 963, 969-970 (5th Cir. 1998); In re Grand Jury Proceedings, 810 F.2d 580, 584-585 (6th Cir.1987). This qualified privilege provides a measure of protection for information acquired by a journalist in the course of gathering news from compelled disclosure. See Cusumano v. Microsoft Corp., 162 F.3d 708, 714 (1st Cir.1998). This privilege is a recognition that society's interests in protecting the news gathering process and in insuring the free flow of information to the public are "of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." Herbert v. Lando, 441 U.S. 153, 183, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (Brennan J., dissenting); In re Madden, 151 F.3d 125, 128 (3d Cir.1998). However, the privilege is qualified, not absolute. Whether the privilege is overcome requires a weighing of the claimed First Amendment privilege and the opposing need for disclosure in light of the facts present in each case. Shoen v. Shoen, 5 F.3d 1289, 1293 (9th Cir. 1993). If H & R is within the protected class, it may claim this qualified constitutional privilege even if it is not entitled to the newsperson's privilege under the New Jersey Shield Law.
*282 Several federal courts in recent years have been asked to determine when an individual or entity may qualify as a "journalist" for purposes of asserting this constitutional privilege. Cusumano v. Microsoft Corp., 162 F.3d 708 (1st Cir.1998); In re Madden, 151 F.3d at 128-129; Shoen v. Shoen, 5 F.3d at 1293-1294; von Bulow v. von Bulow, 811 F.2d 136 (2d Cir.), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). These courts have arrived at a consensus as to what distinguishes an individual or entity entitled to claim the privilege from one who may not.
The Second Circuit was the first federal appellate court to consider who might qualify as a "journalist" for purposes of this privilege. There a civil complaint alleged that Claus von Bulow had injected his wife with an overdose of insulin and other drugs causing her to lapse into a permanent coma. Andrea Reynolds ("Reynolds"), an intimate friend of Claus von Bulow, was his steady companion during von Bulow's state criminal trial. The wife's representative subpoenaed Reynolds seeking a manuscript she wrote about "the von Bulow affair" as well as notes taken during the von Bulow trial and two investigative reports on the von Bulow children which she had commissioned. See von Bulow, 811 F.2d at 139. Reynolds, though claiming the journalist's privilege, admitted that: she had never published any writing under her own name; efforts to sell her story to the New York Post never came to fruition, her manuscript had not been prepared under contact; and, her relationship with the publisher of her proposed book had "nothing to do with ... [her] privileges as a journalist." Id. at 140. The federal district court found that Reynolds was not entitled to avail herself of the journalist's privilege and when she failed to turn over the materials as directed, it adjudged her in contempt.
The Second Circuit affirmed the contempt order. The court found that the journalist's privilege might be successfully asserted if the individual was involved in activities traditionally associated with the gathering and dissemination of news, even if the individual was not a member of the institutionalized press. Id. at 142. Nevertheless, the court found that Reynolds was not entitled to assert the privilege because she had failed to demonstrate that at the beginning of the news-gathering process, she had the intent to disseminate the information to the public. von Bulow 811 F.2d at 145.
The Third Circuit explicitly adopted this "intent to disseminate" test in finding that a commentator on a 900 hotline number maintained by World Championship Wrestling was not entitled to claim the journalist's privilege. In re Madden, 151 F.3d at 128-130. In reaching its conclusion, the Third Circuit observed:
We find that reasoning of the court in von Bulow ... to be persuasive. In our view, the von Bulow test is consistent with the goals and concerns that underlie the journalist's privilege. Because this test emphasizes the intent behind the news gathering process rather than the mode of dissemination, it is consistent with the Supreme Court's recognition that the "press" includes all publications that contribute to the free flow of information .... As we see it, the privilege is only available to persons whose purposes are those traditionally inherent to the press; persons gathering news for publication. It is the burden of the party claiming the privilege to establish their right to its protection.
Id. at 129-130 (citations omitted). Accord Cusumano v. Microsoft Corp., 162 F.3d at 714-715; Shoen v. Shoen, 5 F.3d at 1293-1294.
[11] For the reasons already discussed, the court finds that H & R has failed to establish that at the outset of its information gathering it intended to disseminate it to the public. Since H & R has not established a community "with the goals and concerns that underlie the journalist's privilege," it may not successfully invoke it.

*283 IV
H & R is not entitled to assert the qualified First Amendment privilege designed to shield journalists and those in community with them. Because this is so, the court should not engage in efforts to determine whether the materials sought in the disputed subpoena are available from other sources. See Cusumano v. Microsoft Corp., 162 F.3d at 716-717. This subpoena is subject to R. 4:10-2 which simply requires that the information sought from the nonparty witness be "reasonably calculated to lead to the discovery of admissible evidence ...." A cursory review of the subpoena plainly shows it seeks such information. Of course, if the subpoena seeks trade secret or similar information, H & R is free to seek a protective order or other relief from discovery.

V
Finally, the court recognizes that compliance with the subpoena will force H & R to provide information it asserts is absolutely privileged from disclosure. Trial of the first twelve (12) cases in this consolidated proceeding has been set for October 13, 2000 and the plaintiffs as well as the defendants have sought access to the subpoenaed H & R materials. The Order enclosed with this opinion stays its operation for ten (10) days so that H & R may seek review by the Appellate Division and a continuation of the stay. If no stay has been entered in that time frame, H & R is directed to respond to the subpoena on October 20, 2000 and at that time to produce the materials sought.
NOTES
[1] These actions were consolidated for purposes of discovery and case management. A Special Master was appointed to assist the court in its case management responsibilities. This motion to quash was initially presented to the Special Master. In an opinion dated July 27, 2000 the Special Master recommended that the court quash the subpoena pursuant to the New Jersey Shield Law N.J.S.A. 2A:84A-21 et seq. As already noted, the court declines to follow that recommendation. During the course of oral argument on September 19, 2000 counsel for Napp suggested that the Special Master's recommendation and ruling could only by reviewed under an "abuse of discretion" standard. The court disagrees. The issues involved here call for a ruling as a matter of law. Review of the Special Master's recommendation and ruling on this issue therefore is plenary. Manalapan Realty v. Township Comm. of Township of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969).
[2] Technic is a Rhode Island corporation engaged in the manufacture and sale of chemicals and machinery used in the precious metals plating industry. Technic hired Napp to manufacture a gold precipitating chemical for it called Gold Precipitating Agent 9031 ("GPA"), Technic provided Napp with the formula for GPA as well as the constituent chemicals accompanied by their Manufacturing Safety Data Sheets ("MSDS's"). Technic also provided the MSDS for GPA to Napp. MSDSs are information statements concerning the properties of hazardous chemicals that are required under the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. 29 C.F.R. § 1910-1200(g)(1) requires that MSDSs be made available by employers to employees who might be required to handle such chemicals. Napp was to provide the manufacturing expertise as well as the equipment necessary to perform the blend. Part of that equipment used in the blending operation and in which the explosion occurred was the PK-125 vessel. It is a V-shaped blender manufactured by Patterson-Kelley.
[3] "Prima facie" is defined in Black's Law Dictionary as follows: "At first sight; on the first appearance; on the face of it; so far as can be judged from the first disclosure; presumably; a fact presumed to be true unless disproved by some evidence to the contrary." BLACK'S LAW DICTIONARY 1189 (6th Ed. 1990). The court permitted the parties to supplement the record before it. However, none of the parties did so. As noted, the court considered the Certifications of Jonathan T. Holt and R. Daniel Prentiss, Esq. The court does not reach the question of what discovery, if any, may be had when entities such as H & R assert they are entitled to claim the newsperson's privilege.