907 A.2d 438

IN RE LONG BRANCH MANUFACTURED GAS PLANT.

Superior Court of New Jersey
Law Division Bergen County

Decided May 16, 2005.

256

*Michael Gordon* (*Gordon & Gordon,* attorneys) and *Jacqueline DeCarlo* (*Hobbie, Corrigan, Bertucio & Tashjy,* attorneys), for plaintiffs.

*Anthony J. Marchetta,* for defendants New Jersey Natural Gas Company, New Jersey Resources Corporation, Jersey Central Power & Light Company and FirstEnergy Corporation (*Pitney Harden,* attorneys).

CHARLES WALSH, J.S.C.

This matter is before the court on a motion by defendants New Jersey Natural Gas Company, New Jersey Resources Corporation, Jersey Central Power & Light Company, and First Energy Corporation (collectively "NJNG" or "defendants") seeking to quash a deposition subpoena directed to Barbara M. Beck, Ph.D. ("Beck"), an expert in risk assessment and public communications retained by NJNG and its attorneys.[1] For the reasons that follow, NJNG's motion is denied.[2]

---

[1] NJNG originally sought to quash the deposition notice for Neil S. Shifrin, Ph.D. ("Shifrin"), another principal at Gradient Corporation ("Gradient"), as well. However, plaintiffs advised the court during oral argument on April 29, 2005, that they no longer wished to depose Shifrin regarding the testimony he gave in a prior NJNG lawsuit. Consequently, plaintiffs withdrew opposition to that portion of the motion.

[2] In New Jersey, the burden of establishing the legitimate protection of a privilege is on the party claiming it. *Kerr v. Able Sanitary and Envtl. Servs.,* 295

## I.

According to the plaintiffs' master complaint, NJNG operated a synthetic coal gasification plant located in Long Branch, New Jersey ("Long Branch site" or "the site"). NJNG produced gas at the Long Branch site from 1956 to 1961, and operated a liquid propane gas packing facility at the site from 1962 to 1972. By 1983, NJNG had dismantled most of the above ground gas plant facilities. Investigations into contamination on and around the Long Branch site began in 1983. NJNG's actions at the site, it is alleged, caused environmental damage to the surrounding community and personal injuries to many residents. Further, plaintiffs claim that NJNG knew "decades before" that its alleged discharge of hazardous substances was contaminating the area. Plaintiffs allege that "[d]efendants effectuated this fraud by intentionally and negligently concealing material facts to obscure the damage they caused to the environment and the public, and their intent to avoid responsibility for proper disposal and cleaning up and compensating injured parties for said damage." Beck is a principal of Gradient, a Massachusetts-based environmental consulting firm. Gradient has provided services to NJNG and its attorneys over the past two and a half years in connection with these consolidated cases. Beck also has provided health risk information to the public regarding the Long Branch site. She made public presentations on January 22, 2003, June 4, 2003, and December 11, 2003. The presentations were made to the Long Branch Housing Authority ("LBHA") Board of Directors, and to the public at an open house presentation. Plaintiffs seek to depose Beck regarding her public commentary, as well as to obtain Gradient's files containing the underlying data for these presentations. Plaintiffs claim that these presentations were

---

*N.J.Super.* 147, 684 A.2d 961 (App.Div.1996). As the United States Court of Appeals for the Second Circuit noted: "[i]t is axiomatic that the burden is on the party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow v. von Bulow,* 811 *F.*2d 136, 144 (2nd Cir.1987).

"geared toward diffusing any public outcry among the community residents," which may have included some of the plaintiffs. Plaintiffs argue that they should be permitted to explore the basis for these public presentations because defendants, through Beck, allegedly misrepresented possible health risks. According to them:

[T]he Defendants knowingly misrepresented the health risk associated with past disposal practice by knowingly employing improper techniques and improperly altering its final risk assessment document. Said misrepresentations were made public with the intent that the DEP, local officials, NAACP, public and the plaintiffs be improperly misled into underestimating the extent of the health risk and extent of contamination associated with past plant operations.[3]

During the course of these presentations, Beck apparently discussed the contamination at the Long Branch site, remediation efforts and potential health hazards. According to the PowerPoint presentation used during the January 2003, meeting with the LBHA Board of Directors, Beck appears to have communicated the following information:

● No significant health risk air exposures . . .

● All remedial options offer long-term protectiveness of human health

Similarly, Beck appears to have represented that the health risks resulting from the contamination and remediation were minimal during her presentation to the open house gathering:

● MGP-associated byproducts found in air, soil, and water at LBHA

● No significant health risk

● Concentrations in outdoor air during remediation in same range as concentrations in other NJ cities

°Concentrations in indoor air and average concentrations in surface soil do not exceed NJDEP criteria (except benzene in indoor air)

● Exposures to PAHs [polyaromatic hydrocarbon] in surface soil less than typical exposures to PAHs in consumer products

● Exposures to benzene indoors are less than experienced in some daily activities

● Benzene concentrations in air are less than health effect levels and comparable to background levels

---

[3] Additional fraud facts were submitted by plaintiffs in support of their claims of fraud, concealment, omission, and misrepresentation described in the master complaint.

NJNG acknowledges that those public appearances by Beck took place. Nevertheless, NJNG claims that Beck's role as NJNG's spokesperson is consistent with her responsibilities as a consulting expert, and insulates her from discovery under *R.* 4:10–2(d)(3). Plaintiffs disagree. According to them, Beck cannot shield these public events and the information conveyed during them from discovery. Since Beck's public commentary addressed the health hazards from the contamination, plaintiffs contend that the deposition discovery sought is highly relevant to the parties' fraudulent misrepresentation claims, as well as issues of tolling and estoppel with respect to the applicable statute of limitations.

## II

*R.* 4:10–2(d)(3) provides:

A party may obtain discovery of facts known or opinions held by an expert...who has been retained or specifically employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means.[4]

NJNG claims that *R.* 4:10–2(d)(3) should be read literally here. Because Beck is a non-testifying expert, and plaintiffs have failed to establish that exceptional circumstances exist for discovery to occur, she may not be deposed. In NJNG's view, plaintiffs are not disadvantaged because they can retain their own experts to investigate the same issues that Beck considered. Defendants note that they have already provided discovery to plaintiffs on these subjects, and they have provided the public information

---

[4] New Jersey's rule is virtually identical to its federal counterpart, *Fed.R.Civ.P.* 26(b)(4)(B), which provides that:

A party may discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only...upon a showing of exceptional circumstances under which it is impractical for the party seeking discovery to obtain facts or opinions on the same subject by other means.

prepared and presented by Beck.[5] NJNG claims that, because plaintiffs can easily obtain the same information from other sources, they cannot meet the exceptional circumstances requirement under *R.* 4:10–2(d)(3) as a matter of law.[6]

In general, non-testifying experts are subject to stricter discovery rules than testifying experts. *Santos v. Rando Mach.*

---

[5] Defendants claim that they provided discovery on the same subject "in the form of approximately 250 boxes of documents, NJNG's responses to over 130 interrogatories, multiple depositions of defendants' current and former employees, and public information prepared by the consultants."

[6] The exceptional circumstances test is difficult to meet and is only rarely satisfied. *Graham v. Gielchinsky*, 126 *N.J.* 361, 599 *A.2d* 149 (1991). "The high burden promotes fairness by precluding unreasonable access to an opposing party's diligent trial preparation." *Deffer v. Shop–Rite Supermarkets, Inc.*, 332 *N.J.Super.* 540, 545, 753 *A.2d* 1228 (App.Div.2000) (citations omitted). The exceptional circumstances inquiry turns on whether it is impracticable to obtain information on the same subject by alternative means. *Moore v. Kantha*, 312 *N.J.Super.* 365, 711 *A.2d* 967 (App.Div.1998); *Ager v. Jane C. Stormont Hosp., & Training Sch. for Nurses*, 622 *F.2d* 496 (10th Cir.1980).

> Courts and commentators have commonly identified two situations where the exceptional circumstances standard has been met. The first situation is where the object or condition observed by the non-testifying party is no longer observable by an expert of the party seeking discovery. This situation has been demonstrated where some physical condition has deteriorated enough so that one party's expert may be the only expert who actually could have fairly observed it before its deterioration.... The second situation commonly recognized as constituting exceptional circumstances is where it is possible to replicate expert discovery on a contested issue, but the costs would be judicially prohibitive.
>
> [*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 175 *F.R.D.* 34, 44 (S.D.N.Y.1997)]

*See also Delcastor, Inc. v. Vail Assocs., Inc.*, 108 *F.R.D.* 405 (D.Colo.1985)(finding exceptional circumstances where the defense expert was the only one available to examine a mudslide site the day after the event and before the terrain changed significantly); *Terre Haute Warehousing Serv., Inc. v. Grinnell Fire Prot. Sys. Co.*, 193 *F.R.D.* 561 (S.D.Ind.1999)(Holding that exceptional circumstances existed because only one expert was able to inspect the scene of a fire, which had since been substantially altered); Matthew R. Wildermuth, *Blind Man's Bluff: An Analysis of the Discovery of Expert Witnesses Under Federal Rule of Civil Procedure 26(b)(4) and A Proposed Amendment*, 64 *IND. L.J.* 925 (1989).

*Corp.,* 151 *F.R.D.* 19 (D.R.I.1993). Fairness concerns led to the promulgation of *Fed.R.Civ.P.* 26(b)(4)(B), *R.* 4:10–2(d)(3)'s Federal predecessor and counterpart, because "a non-testifying expert may become a unique repository of insights into counsel's opinion work product although the expert's information is not itself work product." 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, *Federal Practice and Procedure* § 2032 (2d ed. 1994). Where the New Jersey rule is similar to or identical to a federal rule, our courts have often considered the reasoning of federal decisions when interpreting the New Jersey rule. *See Brown v. Brown,* 86 *N.J.* 565, 581–83, 432 *A.*2d 493 (1981).

*Fed.R.Civ.P.* 26(b)(4)(B) recognizes that for non-testifying experts, as opposed to those who will testify at trial, there is no need to gather discovery to ensure a fair and effective trial process. *In re Shell Oil Ref.,* 132 *F.R.D.* 437 (E.D.La.1990). As noted in *Eliasen v. Hamilton,* 111 *F.R.D.* 396 (N.D.Ill.1986):

> [*Fed.R.Civ.P.* 26(b)(4)(B)] is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation, to prevent a party from building his own case by means of his opponent's financial resources, superior diligence and more aggressive preparation, and more specifically, to prevent one party from utilizing the services of the opponent's experts by means of a deposition.
>
> [*Id.* at 401 (citations omitted)]

*See also Durflinger v. Artiles,* 727 *F.*2d 888 (10th Cir.1984); *Deffer supra,* 332 *N.J.Super.* 540, 753 *A.*2d 1228.

While NJNG asserts that *R.* 4:10–2(d)(3) is a virtual bar to Beck's discovery, this court believes that her public appearances and statements made on behalf of NJNG are quite different from the duties of a traditional consulting expert assisting in the technical understanding of complex issues and in trial preparation. As a public spokesperson, Beck played an additional role separate and distinct from whatever role she played or is playing as a nontestifying expert to NJNG and its attorneys. Accordingly, it is important to note that plaintiffs make no greater claim to discovery than that provided in *R.* 4:10–2(a).

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to

the claim or defense of the party seeking discovery or to the claim or defense of any other party.... *It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence;* nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought.

[(Emphasis added).]

In this regard, these public appearances and statements, as well as efforts to prepare for them, fall outside of the protection provided by *R.* 4:10–2(d)(3), and therefore Beck is not immune from discovery on these issues.

## III

### A.

New Jersey courts have observed that an expert may find him or herself beyond the protective shield provided by *R.* 4:10–2(d)(3) when that expert acts in different capacities. In *Franklin v. Milner,* 150 *N.J.Super.* 456, 375 *A.2d* 1244 (App.Div.1977), the Appellate Division recognized that experts can serve in different roles during litigation.[7] There, plaintiff claimed that a physician had acted negligently while treating her. *Id.* at 459, 375 *A.2d* 1244. The physician had performed a laparoscopic tubal ligation during the course of which it was claimed he deviated from standard medical practice when he failed to obtain plaintiff's informed consent. *Ibid.* Plaintiff alleged, among other things, she was not fully alert when the physician relayed the cautionary information. *Ibid.* It was also claimed that the physician failed to properly examine her fallopian tubes after surgery. *Ibid.*

Plaintiff's expert witness reviewed the hospital records and wrote a report, dated November 7, 1974, opining that the defendant physician had deviated from accepted standards of care. The physician's expert responded with a November 25, 1975, report

---

[7] This court also recognized that experts can serve dual roles in *Adler v. Shelton,* 343 *N.J.Super.* 511, 778 *A.2d* 1181 (Law Div.2001). "Of course, it will be true that sometimes a single expert will be employed as both witness and advisor." *Id.* at 522, 778 *A.2d* 1181.

exonerating the defendant. *Id.* at 461, 375 *A.2d* 1244. That report was forwarded to plaintiff's expert, who then commented on it in a letter dated December 15, 1975. *Id.* at 462, 375 *A.2d* 1244. In addition, plaintiff's expert, acting as a consultant to the attorney, discussed several legal issues presented in the case. *Ibid.* This December 15, 1975, letter was forwarded to plaintiff's attorney with a transmittal letter of the same date. *Ibid.*

The defendant physician sought discovery of both December 15, 1975, letters and the trial judge directed discovery. *Ibid.* The Appellate Division reversed. *Ibid.* It determined that only those portions of the two December letters addressing purely medical issues could be discovered. *Id.* at 463–67, 375 *A.2d* 1244. Those portions of the December letters dealing with legal as opposed to medical issues were to be protected under *R.* 4:10–2(d)(3). *Ibid.*

The *Franklin* court recognized that the expert plainly was a witness on the one hand, and a consultant to plaintiff's lawyer on medical-legal matters, on the other. *Id.* at 468–74, 375 *A.2d* 1244. The Appellate Division aptly observed "the basic concept of work-product materials and mental impressions obtained by an attorney in preparation for trial cannot gain for such materials prepared by proposed expert witnesses absolute immunity from disclosure under our rules." *Id.* at 473–74, 375 *A.2d* 1244. Nevertheless, the protection offered under *R.* 4:10–2(d)(3) applied to the opinions dealing with the medical-legal issues. *Ibid.* The other observations by this expert dealing with the medical issues in question, however, were properly discoverable. *Ibid.*

Similar scenarios in the federal courts have resulted in decisions comparable to that reported in *Franklin.* In determining whether a non-testifying consulting expert is sheltered from discovery under *Fed.R.Civ.P.* 26(b)(4)(B), the federal courts have noted that "otherwise protected material will be discoverable where the discovering party has a different avenue to discover the disputed information." *Eliasen, supra,* 111 *F.R.D.* at 399.[8]

---

[8] The Advisory Committee Notes to *Fed.R.Civ.P.* 26 acknowledge that the protections in the rule are not absolute:

For example, if a consulting expert also previously had gained personal knowledge of the events or otherwise had obtained information about the case prior to his or her retention as an expert, discovery would be permitted to these subjects. *See* David H. Marion, et al., *Expert Witnesses: Pitfalls Posed by the Discovery Process,* 3 *Sedona Conf. J.* 199, 205–06 (2003).[9]

*Grinnell Corporation v. Hackett,* 70 *F.R.D.* 326 (D.R.I.1976) is emblematic of this process. There discovery was sought of a report entitled *Welfare and Strikes: The Use of Public Funds to Support Strikers. Id.* at 328–29. It was clearly relevant to the litigation, which revolved around the payment of benefits to striking employees. *Ibid.* The information sought, it turns out, was prepared by a non-testifying expert to satisfy his master's degree thesis requirement. *Id.* at 331. The district court ordered discovery, simply noting that, since "the facts or opinions sought were not prepared for litigation or trial, there is little support for a finding that freely permitting discovery would result in any unfairness to the opposing party." *Ibid.*[10]

---

It should be noted that the subdivision [26(b)(4)] does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

[Advisory Committee Notes, Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 *F.R.D.* 487 (1970).]

[9] Another relatively frequent scenario, which at least partially removes nontestifying consulting experts from the protection of *Fed.R.Civ.P.* 26(b)(4), occurs when a testifying expert reviews or considers the materials prepared by a nontestifying expert. Courts have commonly held that once a testifying expert considers the report of a non-testifying expert, that report is taken out of the coverage of *Fed.R.Civ.P.* 26(b)(4). The documents become subject to discovery in order to allow the adversary to engage in effective and fair cross-examination. *Heitmann v. Concrete Pipe Mach.,* 98 *F.R.D.* 740 (E.D.Mo.1983); *Karn v. Ingersoll–Rand,* 168 *F.R.D.* 633 (N.D.Ind.1996).

[10] The court rationalized that decisions to compel or forbid Rule 26 discovery should be guided by fairness, as opposed to a work product analysis, which has been rejected. *Grinnell Corp., supra,* 70 *F.R.D.* at 333. "This sort of material is

Another federal court reached a similar result when the in-house employees non-testifying experts played several roles, one of which was to act as litigation consultants. *Adams v. Shell Oil Co.*, 134 *F.R.D.* 148 (E.D.La.1990). *See also Barkwell v. Sturm Ruger Co., Inc.*, 79 *F.R.D.* 444 (D.Alaska 1978). The court found they could be deposed about the facts learned and opinions held prior to their litigation-related assignment. *Adams, supra,* 134 *F.R.D.* at 149. The *Adams* court tersely noted that:

> [t]he Rule does not protect facts or opinions of expert employees developed while conducting business activities related to mattes in issue, but before being specially employed.... One may simultaneously be a litigational expert with *R.* 26(b)(4) protection as to some matters and simply an unprotected actor or witness as to others....
>
> [*Id.* at 150 (citations omitted).]

Essentially the same issue was presented in *Marine Petroleum Co. v. Champlin Petroleum Co.*, 206 *U.S.App.D.C.* 31, 641 *F.*2d 984 (D.C.Cir.1980) with similar results. There, Marine Petroleum sued a producer and refiner for violating price stabilization regulations. *Id.* at 987. Marine Petroleum sought to depose the refiner's long-time consulting expert on general energy issues. *Ibid.* The refiner complained that while its expert had routinely furnished general forecasts and economic analyses of the energy industry in the past, he was now specifically retained in connection with the pending litigation. *Id.* at 988. As the United States Court of Appeals for the District of Columbia Circuit saw it, the non-testifying expert "wore two hats that of a general consultant

---

withheld from discovery not because it is work product, but because it is unfair to compel discovery of the consultative opinion of an expert who will not testify on that subject matter at trial." *Inspiration Consol. Copper Co. v. Lumbermens Mut. Cas. Co.*, 60 *F.R.D.* 205, 210 (S.D.N.Y.1973)(also recognizing that experts can wear two hats, and discovery can be limited accordingly).

Some of the previous court decisions had held that an expert's information was privileged simply because of his status as an expert, or that his status brought expert information within the work product doctrine. These theories were completely repudiated by *R.* 26(b)(4). Any restrictions which currently exist on the discoverability of such information are based on the doctrine of 'fairness.' *See* Advisory Committee's Note, 48 *F.R.D.* 497 (1970). [*USM Corp. v. Am. Aerosols, Inc.*, 631 *F.*2d 420 (6th Cir.1980).]

and that of an expert engaged in preparation for litigation." *Ibid.* The information about general energy issues was discoverable and the court accordingly directed disclosure of the facts learned and opinions held prior to that expert's retention in the litigation. *Ibid.*

The *Marine Petroleum* court made a point that has particular resonance here. *Id.* at 993. It noted that it made no difference whether an expert consultant initially served as a general employee or consultant, or had been initially retained in anticipation of the specific litigation. *Ibid.* It was not the temporal relationship of the two roles but rather the different sources from which information is obtained and the different vehicles through which it is disseminated which necessitate protective treatment:

R. 26(b)(4)(B) implicitly recognized that a party might well be deterred from thorough preparation of his case were it possible for his opponent to freely discover information from a hired expert whose assistance is important but not yet so vital as to require his testimony at trial. The rule's tacit acknowledgement of the necessity of meticulous preparation has equal force whether the expert is one originally and exclusively retained for anticipated litigation or one whose employment responsibilities are expanded to encompass consultation and advice in expectation of litigation.

*Marine Petroleum* teaches us that when a non-testifying consulting expert serves in a different capacity from that of a litigation consultant, discovery as to that separate role is not precluded by *Fed.R.Civ.P.* 26(b)(4)(B).

Experts also fall outside of the protection of either federal or state consulting expert privilege rules when they simultaneously are an ordinary actor or witness in a dispute.[11]  For

---

[11] Federal courts have reached similar results even when the expert was designated to give expert testimony. *Nelco Corp. v. Slater Elec., Inc.,* 80 *F.R.D.* 411, 414 (E.D.N.Y.1978). Prior to 1993, depositions of expert witnesses were not routine in the federal system. In a patent dispute case, the plaintiff identified an expert to testify at trial whom the defendant sought to depose. *Id.* at 412–13. However, it turned out that the expert was the inventor and had applied for a patent on the allegedly defective product. *Ibid.* The district court correctly noted that the expert was an "actor" here and could not obtain

example, the United States District Court for the Eastern District of Pennsylvania concluded that a medical examiner expert who performed an autopsy on the plaintiff could be questioned as an ordinary witness in that regard. *Harasimowicz v. McAllister,* 78 *F.R.D.* 319 (E.D.Pa.1978).[12] The district court found that the physician was performing his duties as a medical examiner, and

---

protection from discovery under the rules. *Id.* at 414–15. As the federal judge explained:

> the deponent herein was asked to interpret the claims contained in the patent application which he swore under oath were representative of his inventions. The deponent's intimate association with the subject matter of the claims is readily apparent from the facts before the Court. Having fulfilled his statutory role by submitting the claims in his patent application, it can be said that the deponent clearly has had ample experience as an 'actor' upon which he can base interpretations of these claims... It is equally clear from the facts that the deponent's experience as an actor was gathered prior to the commencement or even the impending threat of the instant lawsuit. Thus, the background and experience utilized for the performance of a statutory duty were not acquired by the deponent as an expert in preparation for or in anticipation of trial but emerged from his activity as an actor or viewer with respect to the transactions or occurrences that are part of the subject matter of the lawsuit... Accordingly, the deponent must be treated as an 'ordinary witness' as to the requested interpretation of the patent claims.
>
> [*Id.* at 415.]

*Fed.R.Civ.P.* 26(b)(4)(B) provides in pertinent part:

(b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

...(4) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable ... and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion....

[12] The expert in this case was expected to testify at trial, and the argument was that he should not be subject to a deposition because of the mandate of *Fed.R.Civ.P.* 26(b)(4)(A)(i), that discovery as to trial experts proceed by interrogatories rather than by deposition. *Harasimowicz, supra,* 78 *F.R.D.* at 319. However, the same concepts of an expert serving in a dual capacity are applicable here.

whatever information obtained in that capacity was not data obtained in anticipation of trial. *Id.* Simply put, calling someone a non-testifying consulting expert does not mean that he or she is automatically and absolutely shielded from discovery on issues that the party knowingly has injected into the case. *Keith v. Van Dorn Plastic Mach. Co.*, 86 *F.R.D.* 458 (E.D.Pa.1980). As to those issues, the "expert" is nothing more than an ordinary fact witness. *Id.* at 459–60.[13]

## B.

Public disclosures that may be related to litigation constitute a completely separate activity and fall outside of the immunity protections of the discovery rules. Work ordinarily performed by a press agent does not constitute legal work and is thus not protected by an attorney-client privilege. It is not ordinarily part of the attorney's legal advice function to prepare public announce-

---

[13] "We believe that an 'actor' or 'viewer' refers, for example, to a doctor who performed an operation that gave rise to a medical malpractice claim, or to an actuary who witnessed an automobile accident. Such witnesses should be viewed as fact witnesses whose depositions as to the facts of the case could be taken without regard to *R.* 26(b)(4)." *Keith, supra,* 86 *F.R.D.* at 459. *But see Hermsdorfer v. Am. Motors Corp.*, 96 *F.R.D.* 13 (W.D.N.Y.1982). There, the expert was retained for a "dual purpose," that of preparing for litigation and also for improving the defective product in issue. The district court found that, under those circumstances, the expert was still protected by the consultative expert rule. This case differs because the expert in *Hermsdorfer* was still merely internally advising the party rather than injecting him or herself into the public debate about NJNG's former gas plant site and its effect on the health of the community. The United States District Court for the Eastern District of Louisiana also found that *Hermsdorfer* was not controlling. *Adams v. Shell Oil Co.*, 134 *F.R.D.* 148, 150 (E.D.La.1990).

In *Hermsdorfer,* the retained expert's knowledge gained in the course of his special employment was used not only to defend a lawsuit, but also for improvement of company operations. The court correctly held that the expert was protected from discovery by *R.* 26(b)(4)(B), even though his expertise was used for dual purposes. Whether the expert could be deposed about pre-retention knowledge was not in issue in *Hermsdorfer.*
[*Id.* at 150.]

ments for the client, although he may well be called upon to review proposed announcements for legal implications.

A complete waiver of privilege was not found because of the issuance of a press release in *Hartford Fire Ins. Co. v. Pure Air on the Lake, L.P.*, 154 *F.R.D.* 202 (N.D.Ind.1993). However, in that case, there was only a "miniscule disclosure" in light of the "massive nature" of the underlying report that did not alter the parties' positions in terms of trial strategies. *Id.* at 211. Of course, the information in the press release itself was waived. *Ibid.*

In *United States v. Gulf Oil Corp.*, 760 *F.*2d 292 (Temp.Emer.Ct.App.1985), background financial documents were prepared in order to satisfy federal securities law reporting requirements. Gulf Oil argued that these documents were work product because they addressed the implications of a declaratory judgment action related to the pricing litigation. *Id.* at 296. The court felt that its "inquiry should be to determine the primary motivating purpose behind the creation of the document." *Id.* at 296. (citations omitted). Therefore, the court found that the documents were not protected as work product because they were created primarily for the separate business purpose of mandatory securities law disclosures, and not in anticipation of litigation. *Id.* at 297.

This court struggled with similar facts, though a different privilege, in *In re Napp Tech., Inc. Litigation*, 338 *N.J.Super.* 176, 768 *A.*2d 274 (Law Div.2000). There, Napp, a chemical processor, hired a public relations firm, Holt & Ross ("H & R"), to advise it on how to communicate to the public in the wake of a massive explosion at the plant. *Id.* at 179, 768 *A.*2d 274. The explosion resulted in fatalities and significant property and environmental damage. *Ibid.* As part of its public relations efforts, H & R distributed two press releases, which discussed the accident and faulted other parties for the explosion. *Id.* at 180–81, 768 *A.*2d 274. Technic, Inc. ("Technic"), one of the parties implicated in the releases, sought discovery relating to H & R's work. *Ibid.*

Specifically, Technic sought documents regarding press statements and communications that H & R had with Napp, its employees and its experts. *Id.* at 181, 768 *A.2d* 274.

H & R argued that it was immune from disclosing this information because of New Jersey's newsperson's privilege. *Ibid.*[14] In this regard, H & R claimed that, because it regularly distributed information to the public, it qualified as a member of the news media. *Ibid.* Technic argued, and this court agreed, that H & R's functions were outside of those traditionally performed by a newsperson. *Id.* at 183, 768 *A.2d* 274. Instead, this court found that H & R "[was] in the business of reputation management, public acceptance of controversial facilities, relationship building, crisis communications and conflict management." *Ibid.*

This court found that the newsperson's privilege was designed to protect those who gather the news. *Id.* at 186–88, 768 *A.2d* 274. The public relations firm there worked as spokespersons on behalf of entities that were the focus of the news gathering. *Ibid.* As H & R did not gather the news with the primary purpose of disseminating it to the public, but instead managed the news for its client's best interest, the court found that H & R was not protected by the newsperson's privilege. *Ibid.*

Beck's efforts, at least insofar as they involved her public appearances and statements on NJNG's behalf, are more akin to public relations management than trial consultation. Accordingly,

---

[14] The statute states, in pertinent part:

> Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public ... has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body ...
>
> (a) The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
>
> (b) Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
>
> [*N.J.S.A.* 2A:84A–21.]

Beck's public relations activities do not fit within the immunity protection provisions of our discovery rules.

■ The non-testifying expert disclosure rules were not intended to immunize consultant experts from discovery when they have played other roles in a controversy. When an expert consultant acts as a public spokesperson for a company, those actions cannot qualify as "consultative" and thus, are not protected by *R.* 4:10–2(d)(3). Accordingly, this court rejects the defendants' efforts to characterize Beck's public "risk communications" activities as part of her consulting responsibilities.

Beck's public statements necessarily amount to activities that are beyond her role as a consultative expert, no matter how defendants attempt to label these activities as being "in anticipation of litigation or preparation for trial." Statements made in a public forum do not warrant an expectation of privacy or confidentiality. The public discussion engaged in by Beck was part of a public relations effort, and the role of a litigation consulting expert cannot be expanded to include such tasks. True, non-testifying consulting experts' activities typically include developing trial strategies and theories, performing investigations related to the litigation, and educating the attorneys, but they do not include advocacy in the court of public opinion. James L. Hayes & Paul T. Ryder, Jr., *Rule* 26(b)(4) of the *Federal Rules of Civil Procedure: Discovery of Expert Information*, 42 *U. Miami. L. Rev.* 1101, 1118 (1988).

Beck's public appearance on behalf of NJNG was more directed to "reputation management, ... crisis communications and conflict management," all of which are tasks traditionally conducted by a public relations firm or public spokesperson. *Napp, supra,* 338 *N.J.Super.* at 183, 768 *A.2d* 274. Her role as a witness in this litigation is obvious, in light of plaintiffs' allegations that her statements may have misrepresented the potential health hazards arising from the problems at the Long Branch site. Thus, plaintiffs will be entitled to depose Beck regarding these public state-

ments and her activities in gathering the information used in them.

The result arrived at by the court comports with the fairness concerns that prompted the federal and New Jersey discovery rules in the first place. Here, the risk of unfair benefit does not exist if Beck's discovery is limited to her public statements and the information upon which they are based. Plaintiffs claim not to seek, nor will they be permitted to obtain, any litigation strategies or other work-product-like efforts that Beck provided to NJNG.

## V

For the reasons stated, the court finds that the plaintiffs are entitled to depose Beck on the subjects identified in this opinion. NJNG's motion to quash plaintiffs' subpoena for the deposition of Beck is denied.